**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| CARRIE CONLEY, LOCKHART WEBB, and ELLA KROMM, individually and on behalf of all others similarly situated; GABRIELA ADLER-ESPINO; and THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA,<br><br>*Plaintiffs,*<br><br>v.<br><br>ALAN HIRSCH, JEFF CARMON, STACY "FOUR" EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections; and KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections,<br><br>*Defendants.* | Case No. 5:25-cv-00193<br><br>**CLASS ACTION COMPLAINT** |

## INTRODUCTION

1.      This case seeks to avert an unprecedented effort to change the results of a statewide election by discarding up to 5,509 votes from military and overseas voters five months after their votes were cast, confirmed, and counted. Those voters, drawn from a selectively targeted subset of four counties, did everything election officials told them to do to successfully vote in 2024. But their vote in one race is in jeopardy because the losing candidate has completed his campaign to force state election officials to retroactively invalidate their votes. The need for federal court intervention to prevent such a grave subversion of the democratic process is urgent.

2. In 2024, 5,540,090 registered voters exercised their right to vote in the general election for Seat Six on the North Carolina Supreme Court. Many of these voters overcame significant obstacles to cast their ballots in the aftermath of a deadly and historically destructive hurricane.

3. By a narrow but conclusive margin, the voters chose the incumbent in the Seat Six race, Justice Allison Riggs, over her challenger, Jefferson Griffin, a sitting judge on the North Carolina Court of Appeals.

4. Now, nearly five months after the votes were cast and counted (and twice recounted), the state of North Carolina has acquiesced in an unprecedented effort to reverse this outcome. At Griffin's behest, the North Carolina Court of Appeals has ordered the North Carolina State Board of Elections ("NCSBE") to declare up to 5,509 votes cast by eligible, qualified voters as presumptively invalid.

5. These voters all registered to vote, cast their ballots, and had those ballots counted under the settled—and widely communicated—rules in place prior to and at the time of the 2024 elections. Specifically, they are overseas civilian and military voters who voted in accordance with the provisions of Article 21A, Chapter 163 of the North Carolina General Statutes, the Uniform Military and Overseas Voters Act ("UMOVA").

6. Under the rules applicable at the time of the 2024 election—as codified in state statute and an explicit NCSBE administrative rule—these voters did not, and indeed could not, submit a copy of their photo ID when voting absentee. Months after the election, the state supreme court changed course, concluding that these voters did in fact need to submit a copy of their photo ID. The application of that change in election rules prospectively is not at issue in this case. What is at issue is the NCSBE's *retroactive* application of this rule to voters in the 2024 elections, who

2

could not possibly have complied with a requirement that, at the time, did not exist. As a result, the NCSBE will disenfranchise these voters, invalidate the results of the Seat Six election, and disregard North Carolinians' choice for a seat on their state's highest court.

7.     Plaintiffs Carrie Conley, Lockhart Webb, and Ella Kromm are all eligible, qualified North Carolinians who voted in the Seat Six election. They are all among the group of voters whose ballots have been presumptively invalidated by the NCSBE. On behalf of themselves and the putative class of all other similarly situated voters, along with the League of Women Voters of North Carolina and Gabriela Adler-Espino, a military spouse, U.S. Air Force teacher, and overseas voter (collectively, "Plaintiffs"), they bring this action for declaratory and injunctive relief to prevent the unconstitutional denial of their fundamental right to vote.

8.     The U.S. Constitution prohibits North Carolina from retroactively applying novel election rules articulated months after the 2024 election to arbitrarily disenfranchise eligible, qualified voters like Plaintiffs. Voters relied on election officials to maintain and enforce lawful election rules, and they relied on election officials' assurances that they had fulfilled all applicable requirements to register and to vote in the Seat Six election. Articulating new rules months after the votes were counted, and then retroactively applying those rules to overturn the democratic choice of the voters, deprives Plaintiffs of their fundamental rights to vote and to due process, which "protects the right of qualified citizens to vote *and to have their votes counted as cast*." *Hendon v. N. Carolina State Bd. of Elections*, 710 F.2d 177, 180 (4th Cir. 1983) (emphasis added).

9.     Moreover, the NCSBE's selective application of new vote counting rules to Plaintiffs and other similarly situated voters violates the U.S. Constitution's Equal Protection Clause. The NCSBE has presumptively invalidated votes cast by Plaintiffs and other overseas and military voters who voted absentee in up to four Democratic-voting counties—Buncombe, Guilford,

3

Durham, and Forsyth—but not votes cast by similarly situated voters who voted absentee in North Carolina's other 96 counties. This "***arbitrary and disparate treatment in the valuation of one person's vote in relation to another's***" cannot stand. *Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020) (emphasis added).

10.    The possibility that affected voters may have an opportunity to "cure" their ballots through an unprecedented and dis-uniform process administered by county election boards does not resolve the unconstitutionality of the NCSBE's actions, nor does it reduce the urgency of Plaintiffs' claims.

11.    The NCSBE's "cure" process selectively imposes additional burdens on some voters to have their votes counted in the Seat Six election—burdens which voters were not required to meet under the rules in place at the time of the Seat Six election, and which the NCSBE has not imposed on other similarly situated voters.

12.    Regardless, presumptively invalidating votes cast by eligible, qualified voters who complied with all rules and requirements in place at the time of the 2024 elections—and then requiring those voters to jump through additional hoops months after the election to have their ballots counted equally in deciding the Seat Six race—is fundamentally unfair, unduly burdensome, and wholly arbitrary. The central fact remains unchanged: the NCSBE is poised to disenfranchise eligible, qualified voters who lawfully cast their ballots in the 2024 Seat Six race, based on the retroactive application of new rules announced *after* the 2024 election. This course of action is patently and fundamentally unfair to voters, results in arbitrary and disparate treatment, and violates numerous provisions of the U.S. Constitution.

13.    This Court's role in protecting North Carolinians' federal constitutional rights is paramount. Plaintiffs respectfully ask this Court to issue an order declaring that retroactively

4

disenfranchising Plaintiffs and similarly situated voters is unlawful under the First and Fourteenth Amendments to the U.S. Constitution; enjoining the NCSBE from retroactively applying state law to discard any ballots cast in the 2024 election; and ordering the NCSBE to immediately certify the winner of the Seat Six election based on its count of the ballots cast by eligible voters whom North Carolina qualified to vote in the 2024 Seat Six election.

**JURISDICTION AND VENUE**

14.     This action arises under the First and Fourteenth Amendments to the U.S. Constitution.

15.     This Court has subject matter jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

16.     This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

17.     This Court has personal jurisdiction over the Defendants, all of whom are citizens and state officials of North Carolina.

18.     At all times relevant to this action, Defendants have acted under color of state law.

19.     Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(2) because this action is predicated upon a federal question and a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in this District.

/ /

/ /

/ /

/ /

5

**PARTIES**

A. <u>**Plaintiffs**</u>

20.    Plaintiff Carrie Conley was born and raised in High Point, North Carolina. She registered to vote in Guilford County when she was 18 years old and has remained a Guilford County voter ever since.

21.    Plaintiff Conley has voted in Guilford County in person, absentee, or using the online overseas and military voter portal while attending college at Appalachian State University, graduate school at the University of North Carolina at Greensboro, and since 2016, as a military spouse who moves frequently, as is a common experience of our servicemembers and their families. While her husband's service to our country has taken them both to military stations in California, back to North Carolina at Fort Bragg, and now to Vicenza, Italy, Conley has continued to vote in the place she considers her home and is her continued legal voting residence: Guilford County, North Carolina.

22.    Plaintiff Conley followed the instructions provided to her by the NCSBE and Guilford County Board of Elections when she requested, filled out, and cast her ballot via the online portal in the 2024 general election. Those instructions did not include any information about providing a copy of her photo ID, nor was there a prompt or means to do so during the online portal voting process.

23.    Plaintiff Conley has not received notification from Griffin or his agent about his election protest. She learned about the protest from an advocacy organization's post on the social media site Instagram. She asked in a comment how she might learn whether her vote in the Seat Six election were being protested, and another reader directed her to a site maintained by Common

6

Cause North Carolina, where Conley learned that she was on Griffin's list of military and overseas voters targeted for failing to provide a photo ID when casting a ballot.

24. Plaintiff Conley searched the list of challenged voters for others she knew but did not find any. She was particularly confused about why her neighbor across the street in Vicenza, a fellow military spouse from North Carolina, who used the very same online portal, following the very same voting rules that Conley had, did not appear on the list. Conley later learned that her neighbor's vote would remain counted because she had voted in Cumberland County, and Griffin had only challenged voters like Conley and her neighbor if they lived in one of up to four out of North Carolina's 100 counties—that is, Cumberland County votes were safe; Guilford County votes were not. Learning of this differential treatment only heightened Conley's distress at having her lawful vote challenged, and now presumptively tossed out. She will be irreparably harmed if the NCSBE invalidates the legal vote she cast following the rules in place for the 2024 election.

25. Plaintiff Lockhart Webb was born in Siler City, North Carolina and raised in Colfax, North Carolina, which is in Guilford County, and where she registered to vote upon turning 18. While she left the state for college, she returned in 2019 and registered to vote, once again, in Guilford County at the Kernersville, North Carolina Department of Motor Vehicles while updating the address on her North Carolina Driver's License.

26. During the 2024 primary and general elections, Plaintiff Webb was living in Saint-Sulpice, Switzerland, where her husband is completing a PhD program. In both elections, she voted using the online portal for military and overseas voters maintained by NCSBE, being careful to follow the instructions provided by Guilford County elections officials. Those instructions did not ask that she submit a copy of her photo ID, nor did the portal provide her with a means of doing so.

27.     Just over a week ago, on April 5, Plaintiff Webb first learned from her sister's partner, who works at a voting rights organization in Washington, D.C., that Griffin protested her vote in the Seat Six election because she did not provide a photo ID when she voted. This caused her great anxiety.

28.     Plaintiff Webb is particularly anxious about the presumptive invalidation of her vote because she and her husband are in the process of moving from Switzerland back to North Carolina, are not at a fixed address during this transition period. Given that she first learned that her vote was challenged several months after Griffin filed his protest, she is worried that she will not reliably receive notifications about the additional steps she will have to take based on new rules announced after the election concluded. She will be irreparably harmed by application of new rules created after the election to some—but not other—overseas North Carolina voters.

29.     Plaintiff Ella Kromm was born in Chapel Hill, North Carolina, and grew up in Durham, North Carolina. She registered to vote in Durham County when she turned 18 and voted by absentee ballot while attending college in Massachusetts. In September 2024, she travelled to Seville, Spain, for a one-year job teaching English at an elementary school. She voted in this year's election using the electronic transmission portal maintained by the NCSBE for overseas North Carolina voters and justifiably relied on election officials that she had successfully cast her ballot. As a Durham County voter who used this NCSBE portal to vote, her vote is set to be presumptively discarded because she did not supply a copy of her photo ID when she voted.

30.     Plaintiff Kromm has received no notice at her current address from Griffin or his agent about his election protest, but learned from her parents that her name was on his protest list. She was deprived of an opportunity to participate in any proceedings to discard her votes. She will be irreparably harmed if the NCSBE invalidates her lawfully cast and counted ballot.

31.     Plaintiff Gabriela Adler-Espino was born in Puerto Rico and has lived in Florida and North Carolina, as her father's duty station as a member of the U.S. Coast Guard changed. She moved with her family to Pasquotank County in 2021. Shortly thereafter, she married a servicemember in the U.S. Navy and moved to New Bern, North Carolina with her husband, registering to vote there in 2024. In July 2024, Plaintiff Adler-Espino's husband was transferred to a duty station in Okinawa, Japan, and she moved there with him. She voted in this year's election using the portal maintained by the NCSBE for overseas North Carolina voters.

32.     While Griffin has challenged military and overseas voters in Buncombe, Durham, Forsyth, and Guilford Counties who voted through the UMOVA process but did not supply a photo ID when they voted—and the portal provides no mechanism to do so—he did not protest Plaintiff Adler-Espino's vote on those grounds, as her vote was tallied in Craven County. Griffin did, however, protest her vote on the grounds that her voter file is "incomplete."

33.     Plaintiff Adler-Espino has received no notice from Griffin or his agent about his election protest, but learned from a friend still living in the U.S. that her name was on his protest list. She was deprived of an opportunity to participate in any proceedings to discard her votes. She will be irreparably harmed if the NCSBE invalidates her lawfully cast and counted ballot.

34.     Given the uncertainty of the NCSBE's proceedings with respect to voters impacted by its new rules for military and overseas portal voters in the 2024 Seat Six election, Griffin's challenge of Plaintiff Adler-Espino's vote on meritless grounds, and the dubious factual basis on which the NCSBE's "cure" process appears likely to proceed, Plaintiff Adler-Espino reasonably fears that the ongoing battle to invalidate legal North Carolina votes will cause her irreparable harm.

9

35.     Plaintiff the League of Women Voters of North Carolina ("LWVNC" or the "League") is a nonpartisan, nonprofit organization whose mission is to facilitate informed and active participation in government by all Americans, increase understanding of major policy issues, and advocate for legislative changes and policies for the public good. LWVNC is the North Carolina state affiliate of the League of Women Voters ("LWV"), a nonprofit, nonpartisan, grassroots, community-based membership organization headquartered in Washington, D.C. working to protect and expand voting rights and ensure everyone is represented in our democracy. LWV empowers voters and defends democracy through advocacy, education, mobilization, and litigation at the local, state, and national levels. Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League now has more than a million members and supporters and is organized in nearly 800 communities and in every state and the District of Columbia. Members of state and local Leagues are also members of LWV.

36.     LWVNC accomplishes its mission, in part, by encouraging North Carolina citizens to register to vote, including by assisting them with the process, and promoting robust civic participation through voter education and assistance to facilitate participation in the electoral process. The League has approximately 1,900 members throughout North Carolina.

37.     The League has active members whose validly cast votes Griffin is challenging. Such members include Alana Pierce, a resident of Buncombe County.

38.     To serve the League's interests in helping to make sure that every eligible voter who wants to vote will have their vote counted, the League will have to divert its resources away from other programs this spring to devote significant time and effort to counteract the harmful effects of the presumptive disenfranchisement these military and overseas voters face. It will be compelled

to also divert its resources to raise awareness and assist voters in navigating the forthcoming "verification" process that will affect the voters the League assists.

**B. Defendants**

39.    Defendant Alan Hirsch is a member and Chair of the NCSBE. He is sued in his official capacity.

40.    Defendant Jeff Carmon is a member and Secretary of the NCSBE. He is sued in his official capacity.

41.    Defendant Stacy "Four" Eggers IV is a member of the NCSBE. He is sued in his official capacity.

42.    Defendant Kevin N. Lewis is a member of the NCSBE. He is sued in his official capacity.

43.    Defendant Siobhan O'Duffy Millen is a member of the NCSBE. She is sued in her official capacity.

44.    Defendant Karen Brinson Bell is the Executive Director of the NCSBE. She is sued in her official capacity.

**FACTUAL ALLEGATIONS**

**A.    The 2024 Election for Seat Six on the North Carolina Supreme Court.**

45.    In 2024, the people of North Carolina voted for Justice Riggs to retain her seat on the North Carolina Supreme Court.

11

46.   The result was a close but decisive victory for Riggs: the canvassed election results reflect that 2,770,412 North Carolinians voted for Riggs, compared to 2,769,678 who voted for Griffin.[1]

47.   At Griffin's request, the NCSBE conducted a machine recount, which confirmed Justice Riggs' 734-vote victory.[2]

48.   The NCSBE then conducted an additional partial hand recount, again at Griffin's request, in all 100 counties. This recount again confirmed the result of the election. Because Riggs picked up additional votes in the partial hand-recount, the NCSBE did not order a full hand recount of all ballots in the Seat Six contest, consistent with North Carolina law.[3]

49.   Each individual Plaintiff is among the 5,540,090 North Carolinians who cast and had their ballots counted in the 2024 Seat Six election, as are hundreds of members of Plaintiff North Carolina League of Women Voters. Plaintiffs also voted in other federal, state, and local contests that appeared on their 2024 general election ballot.

50.   Plaintiffs complied with all requirements maintained and enforced by the NCSBE and their county election officials prior to and at the time of the 2024 election, including the requirements for registering to vote and voting in state elections.

51.   Nevertheless, the NCSBE has now, at Griffin's behest, presumptively invalidated Plaintiffs' lawfully cast votes, solely in the Seat Six election, and will discard Plaintiffs' lawfully cast votes unless they undertake additional actions not required prior to or at the time of the 2024 elections.

---

[1]  *See* N.C. State Bd. Elections, *11/05/2024 Official General Election Results - Statewide*, https://perma.cc/LN2R-BNGR.

[2]  *See* N.C. State Bd. Elections, *2024 November General Election Recount* (updated Dec. 3, 2024), https://perma.cc/2SBS-4L3X.

[3]  *See* N.C. State Bd. Elections, *State Board Will Not Order Full Recount in NC Supreme Court Contest* (Dec. 10, 2024), https://perma.cc/8TJW-DBYJ.

52.    Plaintiffs represent the group of challenged military or overseas civilian voters. They registered and voted in accordance with the provisions of Article 21A, Chapter 163 of the North Carolina General Statutes, the Uniform Military and Overseas Voters Act ("UMOVA"), which implements the federal law for military and overseas voters titled the Uniform and Overseas Citizens Absentee Voting Act ("UOCAVA"),[4] as well as the NCSBE's administrative rules to implement the UMOVA.[5]

53.    Under these rules, Plaintiffs Conley, Webb, Kromm, League member Pierce, and similarly situated voters were neither required nor prompted to submit a copy of their photo identification with their absentee ballot.

54.    Plaintiff Adler-Espino voted using the very same process as Plaintiffs Conley, Webb, Kromm, and League member Pierce, but Griffin did not challenge Adler-Espino's vote on these grounds because she does not live in one of the four counties Griffin targeted.

55.    Plaintiffs refer to this group of voters as the UMOVA List Class, further described *infra*.

56.    Plaintiffs registered to vote and cast their ballots in accordance with the requirements maintained and enforced by the NCSBE prior to and at the time of the 2024 election, including the requirements in the following paragraphs.

57.    All persons who register to vote in North Carolina must affirm on the voter registration form that they meet all the qualifications to vote, under penalty of a Class I felony.[6]

---

[4] *See* 52 U.S.C. §§ 20301-20311.

[5] *See* 2011 N.C. Sess. Laws 687 (Session Law 2011-182); *see also* 08 N.C. Admin. Code 17.0109(d).

[6] *See* N.C. Gen. Stat. §§ 163-82.4(c)(1), (e).

58. All absentee voters must provide either their driver's license number, the last four digits of their social security number, or the number of their special identification card for non-drivers when requesting an absentee ballot.[7]

59. Civilian domestic absentee voters voting under Article 20 must provide a copy of their voter identification when they submit their ballot.[8]

60. Civilian overseas voters and military voters can vote using the absentee voting process provided under Article 21A of state law, titled the UMOVA law, which implements the UOCAVA federal law and establishes a separate absentee voting process for civilian overseas voters and military voters compared to the process for domestic absentee voters under Article 20.

61. Voters eligible to use the Article 21A process must confirm their identity by submitting required information on their absentee ballot request form and signing a declaration attesting to their eligibility to vote, called an Affirmation of Military-Overseas Voter.[9]

62. Pursuant to state and federal laws as interpreted up to and prior to the 2024 election, civilian overseas voters and military voters may vote absentee in state elections without submitting a copy of their photo identification using the NCSBE's online portal.

63. The NCSBE's online portal for eligible Article 21A absentee voters does not provide voters with any prompt or opportunity to submit a copy of their photo identification alongside their cast ballot.[10]

---

[7] *See* N.C. Gen. Stat. §§ 163-230.2(a)(4), 163-230.3(b)(1).

[8] *See* N.C. Gen. Stat. § 163-230.1(f1).

[9] *See* N.C. Gen. Stat. §§ 163-258.4(e), 163-258.17.

[10] *See* N.C. Gen. Stat. § 163-258.2(1); *see also* 08 N.C. Admin. Code 17.0109(d) ("Exception for Military and Overseas Voters") (stating that overseas and military voters were "not required to submit a photocopy of acceptable photo identification" when voting absentee).

14

64. Alternatively, civilian overseas voters and military voters may vote absentee in state elections by submitting a federal write-in absentee ballot, eligible to be used in state elections, which also does not require (or provide an opportunity for) voters to submit a copy of their photo identification when voting.[11]

65. All the above rules were put in place prior to, and applied during, the 2024 general elections in North Carolina, including in the Seat Six general election.

B. **Lack of Pre-Election Challenges to the Established Election Rules.**

66. The requirements for military and overseas civilian voters to cast absentee ballots were established in 2011, when the North Carolina General Assembly unanimously enacted the UMOVA, codified in Article 21A.[12] The UMOVA implements the federal UOCAVA laws. North Carolina's UMOVA laws prescribe the voting procedures for military and overseas civilian voters under state law in federal, state, and local elections.

67. The UMOVA authorizes military and overseas civilian voters to vote absentee using a federal form or an NCSBE online portal, neither of which requires (or facilitates) voters to submit a copy of their photo identification.

68. After it was initially put on hold due to ongoing litigation, North Carolina implemented a photo ID requirement for domestic voters in 2023.[13]

69. This requirement is contained in Article 20, which provides rules for domestic absentee voters, *not* the separate Article 21A, which provides the framework for all "covered voters," including overseas civilian and military voters.[14]

---

[11] *See* N.C. State Bd. of Elections, *Federal Write-In Absentee Ballot*, https://perma.cc/FKL4-ZLCH.

[12] *See* 2011 N.C. Sess. Laws 687.

[13] *See* N.C. Gen. Stat. § 163-230.1(f1).

[14] N.C. Gen. Stat. § 163-258.2(1).

15

70.    In implementing the domestic civilian absentee voting law in 2024, the NCSBE made clear, in a unanimously adopted administrative rule titled "Exception for Military and Overseas Voters," that overseas and military voters were "not required to submit a photocopy of acceptable photo identification" when voting absentee.[15]

71.    The NCGOP raised no objection to this aspect of the NCSBE's administrative rule while it was pending. The NCGOP did provide comment on other aspects of the rule that the NCSBE was considering, but not the rules for UMOVA voters.[16]

72.    On information and belief, the NCSBE received no testimony contesting the proposed rule that UMOVA voters casting their absentee ballots under Article 21A were not required to fulfill the additional requirements for civilian domestic absentee voters under Article 20.

73.    The NCSBE adopted the rule from a nearly identical temporary rule put in place on August 23, 2019, soon after the General Assembly had initially enacted the photo ID requirement for domestic absentee voters.[17]

74.    The "Exception for Military and Overseas Voters" rule became a temporary rule on August 1, 2023.

75.    In March 2024, this rule was approved unanimously by the Rules Review Commission, an agency appointed by state legislative leaders that is required to object to rules proposed by an administrative agency if those rules exceed the authority of the agency to adopt them.[18]

---

[15] 08 N.C. Admin. Code 17.0109(d).

[16] *See* Public Comments at 38-44, *Republican National Committee and the North Carolina Republican Party public comment on proposed administrative rules* (Jan. 16, 2023), https://perma.cc/J466-B9GA.

[17] *See* Enactment of Temporary Rule 08 N.C. Admin. Code 17.0109 (Dec. 16, 2019) (summarizing temporary rulemaking process), https://perma.cc/4D7A-K2LJ.

[18] *See* N.C. Office of Administrative Hearings, *List of Approved Permanent Rules* (Mar. 27, 2024), https://perma.cc/SB5X-GLTW; *see also* N.C. Gen. Stat. §§ 143B-30.1(a), 150B-21.9(a)(1).

76.    The General Assembly's Joint Oversight Committee, which reviews any agency rule that the Commission adopts, also did not raise any concerns.[19]

77.    The rule became a permanent rule effective April 1, 2024.[20]

78.    The NCSBE informed military and overseas civilian voters on its website that they were authorized to "vote for all federal, state, and local contests" without any requirement that they provide a copy of their photo ID.[21]

79.    Thus, before the 2024 election, the NCSBE—and numerous other state officials—repeatedly reinforced to overseas civilian and military voters that they would be able to vote in federal, state, and local elections without providing a copy of their photo ID.

80.    Indeed, as reported publicly, some voters who tried to submit a photo ID along with their absentee ballot using the NCSBE portal were unable to do so and were explicitly told that it was unnecessary for them to do so in order to cast their votes.[22]

81.    Consistent with this guidance, overseas and military voters, including Plaintiffs, were permitted to vote in the Seat Six general election without providing a copy of their photo identification, and those votes were counted by the NCSBE.

82.    On October 2, 2024, three individual voters, the RNC, and the NCGOP filed a lawsuit in Wake County Superior Court challenging the eligibility of one category of overseas voters

---

[19] *See* Joint Legislative Oversight Committee on General Government, *March 2024 Meeting Agenda* (Mar. 26, 2024) (making no mention of 08 N.C. Admin. Code 17.0109), https://perma.cc/BRR9-TGF4; *see also* N.C. Gen. Stat. § 120-70.101.

[20] *See* 08 N.C. Admin. Code 17.0109 (listing effective date of April 1, 2024), https://perma.cc/K3NU-4HLM.

[21] *See* N.C. State Bd. of Elections, *FAQ: Military and Overseas Voting* (last accessed Feb. 11, 2025), https://perma.cc/2T5L-TMZY.

[22] *See* Lynn Bonner, *NC overseas voters were told they didn't need photo ID. Now their votes are in jeopardy.*, NC NEWSLINE (Feb. 7, 2025) (voter explaining that "[t]he State Board of Elections explicitly represented to me at the time of submitting my Federal Post Card Application, at the time of returning my UOCAVA Ballot, and at all times through the election and canvass that submission of a photo ID or photocopy thereof was NOT required for UOCAVA voters."), https://perma.cc/PWH2-MQCA.

authorized to vote under the UMOVA: the children of overseas North Carolinians who had never themselves lived in North Carolina.[23]

83.     On October 21, 2024, the Wake County Superior Court entered an order denying the plaintiffs' motion for a temporary restraining order, explaining that the plaintiffs had not established the likelihood that they would ultimately prove the unconstitutionality of a statute "on the books at least since 2011 as a bill adopted with bi-partisan support . . . [which] has not been challenged until the filing of this complaint and motion."[24] The court further noted that the plaintiffs had "been involved in elections under the existing statute since its passage without complaint."[25]

84.     On October 29, 2024, a three-judge panel of the North Carolina Court of Appeals unanimously denied the RNC and NCGOP's petition for a writ of supersedeas and dismissed their motions for a temporary stay and temporary injunction.[26]

85.     On November 1, 2024, after the RNC and NCGOP filed an emergency petition at the North Carolina Supreme Court, the court directed the NCSBE to file its response by November 4.[27]

86.     The Court took no further action on the petition prior to election day.

87.     In sum, before the 2024 election, the NCSBE provided clear and uncontested instructions—consistent with longstanding practice and the rules for military and overseas voting

---

[23] *See* Complaint, *Kivett v. N.C. State Bd. Elections*, No. 24CV031557-910 (N.C. Super. Ct., Oct. 2, 2024), https://perma.cc/89MX-ZSJT.

[24] Order Denying Plaintiffs' Motion for Temporary Restraining Order at 2, *Kivett v. N.C. State Bd. Elections*, No. 24CV031557-910 (N.C. Super. Ct., Oct. 21, 2024), https://perma.cc/XF8B-XNDU.

[25] *Id.*

[26] *See* Order, *Kivett v. N.C. State Bd. Elections*, No. P24-735 (N.C. Ct. App., Oct. 29, 2024), https://perma.cc/G5TR-BXBS.

[27] *See* Order, *Kivett v. N.C. State Bd. Elections*, No. 281P24 (N.C. Supreme Ct., Nov. 1, 2024), https://perma.cc/HZY6-LJYH.

in federal elections under federal law—that individuals covered under the state UMOVA law could vote in the Seat Six election through a special absentee voting process that did not require these voters to provide their photo ID when casting their ballots.

**C. Griffin's Post-Election Protests to Counties and the NCSBE**

88.    Prior to the 2024 election, Griffin did not challenge or otherwise contest any of North Carolina's voter registration or eligibility rules or voting procedures.

89.    Griffin ran for a seat on the Wake County District Court in 2016 and for a seat on the North Carolina Court of Appeals in 2020. During the 2016 and 2020 elections, Griffin did not challenge the legality of votes cast by voters utilizing the procedures set forth in the UMOVA and accompanying rules.

90.    On information and belief, in 2019 and 2020, while serving in the military, Griffin voted absentee using the NCSBE's portal without providing a copy of his photo ID.[28]

91.    Griffin did not raise any challenge to the applicable rules for voter eligibility until *after* election officials reported the official results showing that he lost the 2024 election for Seat Six on the North Carolina Supreme Court.

92.    On November 19, 2024, after votes were cast and while the recount process was ongoing, Griffin—along with three other Republican candidates who lost close state legislative races—filed hundreds of protests across the state alleging that tens of thousands of general election voters' ballots were invalid.

93.    The protestors mailed some targeted voters a postcard, with the sender identified as the NCGOP.

---

[28] *See* Doug Bock Clark, *North Carolina Supreme Court Candidate Wants Military Absentee Votes Tossed. Years Earlier, That's How He Voted.*, PROPUBLICA (Jan. 18, 2025), https://perma.cc/VP87-9GQU.

94.    The addressee on the postcard was, in many cases, a specific name "or current resident," indicating to recipients that the card did not convey information relevant to them specifically.

95.    Addressing the postcard in this way also meant that it would not be forwarded even if the voter-recipient were away and had identified a forwarding address with the Post Office.

96.    The postcard said that the recipient's vote (or that of the "current resident") "may be affected by one or more protests filed in relation to the 2024 General Election," and indicated they could scan a QR code to search for further information.

97.    If voters had a smartphone and were willing and able to scan the QR code, they were taken to a website hosted by the NCGOP containing links to the hundreds of protests filed by all four of the protestors.[29]

98.    After navigating to this link, voters would need to locate their name in one of numerous jumbled PDFs of spreadsheets, some of which contained hundreds of disorganized entries across multiple pages, many including thousands of un-alphabetized names.

99.    The website provided no further instructions for how recipients were to navigate the numerous PDFs to learn whether their vote was being protested, by whom, and on what basis.

100.  Many voters who were targeted did not receive the postcard at all and report that they first learned that their vote was being protested from friends, neighbors, family members, and voting rights advocacy organizations. This includes some Plaintiffs.

101.  On November 20, 2024, the NCSBE conducted an emergency meeting and resolved to take jurisdiction pursuant to its statutory authority under N.C. Gen. Stat. § 163-182.12 over Griffin's protests challenging, as relevant here, two categories of voters: (1) votes cast by voters

---

[29] *See* N.C. Republican Party, *Election Protest 2024*, https://perma.cc/R4MS-VQLT.

who Griffin challenged because their entries in the NCSBE voter registration database did not show a driver's license number or the last four digits of their social security number; and (2) votes cast by overseas civilian and military voters who Griffin challenged because, consistent with state and federal law, they voted absentee without submitting a copy of their photo ID along with their ballot.[30]

102. Griffin only protested votes cast by overseas civilian and military voters in up to four counties—Guilford, Durham, Forsyth, and Buncombe.

103. Griffin submitted his protest to the 1,409 Guilford County voters by the statutory deadline.

104. He purported to "supplement" this protest category by also belatedly contesting the ballots of UMOVA List voters in Durham, Forsyth, and Buncombe Counties—totaling 5,509 across the four counties.

105. The voting patterns in these counties tend to heavily favor Democratic candidates.

106. On information and belief, Griffin targeted only these four counties, and left unprotested the identically situated voters in 96 other counties, on an arbitrary basis and not for any legitimate reason.

107. The NCSBE conducted a public hearing on December 11, 2024.

108. On December 13, 2024, the NCSBE issued an order dismissing Griffin's protests.[31]

109. The NCSBE first determined that Griffin's method of effectuating service failed to comply with its administrative notice requirements because he failed to deliver physical copies of the relevant filings to targeted voters.

---

[30] Griffin also challenged votes cast by overseas residents who had never physically resided in the state of North Carolina. Plaintiffs do not challenge the NCSBE's treatment of these voters in the instant complaint.

[31] See Decision and Order at 40, *In re Election Protests of Jefferson Griffin, Ashlee Adams, Frank Sossamon, and Stacie McGinn*, N.C. State Bd. Elections (Dec. 13, 2024), https://perma.cc/M6GJ-MBSC.

110. The NCSBE further determined that his method of service failed to comport with the targeted voters' procedural due process rights under the Due Process Clause of the Fourteenth Amendment.[32]

111. The NCSBE next concluded that even if Griffin had properly served the targeted voters with his protests, there was no legal basis for discarding these voters' votes.

112. The NCSBE dismissed Griffin's protests regarding overseas military and civilian voters who voted under the UMOVA.[33]

113. The NCSBE explained that the requirements for voting absentee for military and overseas voters were governed by Article 21A of Chapter 163 of the North Carolina General Statutes.[34] These laws allow military and overseas civilian voters to vote by using a federal form which "require[s] the voter to provide their name, birthdate, and their driver's license number or social security number" and declare under penalty of perjury that this information is accurate.[35] As the NCSBE noted, Article 21A also expressly provides that "[a]n authentication" other than this declaration "*is not required for execution of a document under this Article*."[36]

114. The NCSBE explained that after North Carolina's general voter identification law took effect in 2023, the NCSBE promulgated an administrative rule forbidding county boards of election from requiring overseas voters, including military personnel, to provide a photo identification, which "was approved unanimously by the Rules Review Commission, an agency

---

[32] *Id.* at 12-14.

[33] *Id.* at 32.

[34] *Id.* at 32-33.

[35] *Id.* at 33.

[36] *Id.* (quoting N.C. Gen. Stat. § 163-258.17(a)) (emphasis in original).

appointed by the leadership of the General Assembly that is required to object to rules proposed by an administrative agency if those rules exceed the authority of the agency to adopt them."[37]

115. Further, the NCSBE explained that the federal UOCAVA law forbade the state from imposing a photo ID requirement on overseas voters.[38]

116. Regardless, the NSCBE again concluded that retroactively applying a novel interpretation of state law to disenfranchise voters in the 2024 elections would violate the federal constitution.[39]

117. With respect to all of Griffin's protests, the NCSBE reasoned that even if Griffin's state law legal theories had merit, "it would violate the federal constitution's guarantee of substantive due process to apply such a newly announced rule of law to remove voters' ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots."[40]

118. In a subsequent order, the NCSBE dismissed Griffin's remaining protests and his request for a complete hand recount of ballots cast in one county.[41]

119. The order also dismissed protests from the three losing Republican legislative candidates on identical grounds. The legislative candidates took no further action on the protests; their opponents were sworn in in January and are serving in the North Carolina General Assembly.

/ /

---

[37] *Id.* at 37.

[38] *Id.* at 37-38.

[39] *Id.* at 39.

[40] *Id.* at 32. For this and other reasons, the NCSBE also dismissed Griffin's protests targeting "overseas-citizen voters who have never resided in the United States but whose parents resided in North Carolina before moving abroad" who voted under the UMOVA. *Id.* at 29.

[41] *See* Decision and Order, *In re Election Protests of Jefferson Griffin, Ashlee Adams, and Stacie McGinn* (December 27, 2024), https://perma.cc/4T24-WSQW.

23

**D. Griffin's appeal of the NCSBE's dismissal of his election protests.**

120. Under North Carolina law, a candidate for the state supreme court may appeal an NCSBE order dismissing their election protest in the Wake County Superior Court.[42]

121. Instead of following this mandatory appeals process, on December 18, 2024, Griffin filed a petition for writ of prohibition directly in the North Carolina Supreme Court, asking the very court he hopes to join for an order requiring the NCSBE to discard votes cast by the voters he had targeted in his post-election protests and to certify him as the winner of the Seat Six election.[43]

122. The following day, the NCSBE removed the case to federal court.[44]

123. On December 20, 2024, Griffin filed three additional separate actions in the Wake County Superior Court seeking judicial review of the NCSBE's decision denying the categories of election protests over which the NCSBE took jurisdiction.[45]

124. The NCSBE also immediately removed these cases to federal court.[46]

125. On December 31, 2024, the RNC, NCGOP, and others filed another lawsuit, this time in the Wake County Superior Court, challenging votes cast by individuals whose public voter files was allegedly missing certain information.[47]

---

[42] *See* N.C. Gen. Stat. § 163-182.14.

[43] *See* Petition for Writ of Prohibition, *Griffin v. N.C. State Bd. Elections* (N.C. Supreme Ct., Dec. 18, 2024), https://perma.cc/98XL-T4NX.

[44] *See* NCSBE's Notice of Removal, *Griffin v. N.C. State Bd. Elections*, No. 5:24-cv-00724 (E.D.N.C. Dec 19, 2024), ECF 1.

[45] *See Griffin v. N.C. State Bd. Elections*, Nos. 24CV040622-910, 24CV040619-910, and 24CV040620-910 (Wake Cnty. Sup. Ct. 2024).

[46] *See Griffin v. N.C. State Bd. Elections*, No. 5:24-cv-00731 (E.D.N.C. Dec 20, 2024), ECF 1.

[47] *See Kivett et al. v. N.C. State Bd. Elections*, No. 24CV041789-910 (Wake Cnty. Sup. Ct., Dec. 31, 2024), https://perma.cc/V8RC-59MW.

24

126. The NCSBE likewise removed the RNC's case to federal court.[48]

127. On January 6, 2025, the Eastern District of North Carolina concluded that it could exercise federal removal jurisdiction over the removed cases filed by Griffin, but it abstained from doing so and remanded the cases back to the North Carolina state courts.[49]

128. The District Court explained that while it could exercise subject-matter jurisdiction under 28 U.S.C. § 1443(2), it would "abstain[] from deciding Griffin's motion under *Burford*, *Louisiana Power*, and their progeny,"[50] reasoning in part that North Carolina's state courts were "competent to protect federal constitutional rights."[51]

129. The NCSBE immediately appealed,[52] and the cases filed by Griffin were consolidated at the Fourth Circuit.[53]

130. The day after receiving the remanded cases, the North Carolina Supreme Court issued an emergency stay order that indefinitely enjoined the NCSBE from certifying Riggs as the winner of the Seat Six election and expediting the briefing schedule on Griffin's petition for a writ of prohibition. Two justices dissented from the order granting the stay on the grounds that the law forbade the NCSBE from issuing Griffin's requested relief.[54]

131. In the meantime, the Fourth Circuit expedited the NCSBE's appeal of the District Court's remand order.[55]

---

[48] *See* NCSBE's Notice of Removal of Civil Action, *Kivett et al v. NC State Board of Elections*, No. 5:25-cv-00003 (E.D.N.C. Jan 02, 2025), ECF 1.

[49] *See* Order, *Griffin v. N.C. State Bd. Elections*, No. 5:24-cv-00724 (E.D.N.C. Jan 6, 2025), ECF 50.

[50] *Id.* at 1.

[51] *Id.* at 23.

[52] *See* NCSBE's Notice of Appeal, *Griffin v. N.C. State Bd. Elections*, No. 5:24-cv-00724 (E.D.N.C., Jan 6, 2025), ECF 52.

[53] *See* Order, *Griffin v. N.C. State Bd. Elections*, No. 5:24-cv-00724 (E.D.N.C., Jan 7, 2025), ECF 59.

[54] *See* Amended Order, *Griffin v. N.C. State Bd. Elections*, No. 320P24 (N.C. Supreme Ct., Jan 7, 2025), https://perma.cc/SV8D-3EK7.

[55] *See* Order, *Griffin v. Riggs*, No. 25-01024 (4th Cir., Jan 10, 2025), ECF 27.

132.  The RNC and NCGOP case in Wake County Superior Court was stayed by the North Carolina Court of Appeals pending the North Carolina Supreme Court's or Fourth Circuit's resolution of Griffin's claims.[56]

133.  On January 22, 2025, a divided North Carolina Supreme Court dismissed Griffin's petition for a writ of prohibition to allow for the cases Griffin had filed directly in the Wake County Superior Court to proceed. Once again, two justices dissented.[57]

134.  The North Carolina Supreme Court maintained the stay order that purports to prevent the NCSBE from certifying the Seat Six election for Riggs based on the fully canvassed results reflecting her lawful victory.

135.  On February 4, 2025, the Fourth Circuit issued a *per curiam* opinion confirming that the District Court properly exercised removal jurisdiction over Griffin's appeals of the NCSBE's denials of his election protests.[58]

136.  The Fourth Circuit affirmed that it was proper for the District Court to abstain from deciding the federal law questions, but clarified that abstention was appropriate on *Pullman* grounds, such that the federal district court would retain jurisdiction over the parties' federal claims while the state courts adjudicated the parties' state law arguments. The panel noted that "the resolution of [the novel] issues of North Carolina law could avoid the need to address the federal constitutional and other federal issues the [NCSBE] raised in removing the case," citing as an

---

[56] *See* Order, *Kivett et al. v. N.C. State Bd. Elections*, No. P25-30 (N.C. Ct. App., Jan. 17, 2025), https://perma.cc/V87T-S26Q.

[57] *See* Order, Griffin v. N.C. State Bd. Elections, No. 320P24 (N.C. Supreme Ct., Jan. 22, 2025), https://perma.cc/6XAJ-VKL9.

[58] *See* Order, *Griffin v. Riggs*, No. 25-01024 (4th Cir., Feb. 4, 2025), ECF 122.

example the possibility that the NCSBE would "prevail[] in Wake County on the state law issues."[59]

137.  Riggs and the NCSBE each filed a letter in the state court proceedings indicating that they intended to reserve the federal law questions for the federal court, as was its right under *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964) and as discussed in the Fourth Circuit's *per curiam* order.

138.  On February 7, 2025, the Wake County Superior Court affirmed the NCSBE's dismissal of each category of protests filed by Griffin after the 2024 election, concluding that the NCSBE's dismissals were "not in violation of constitutional provisions . . . not in excess of statutory authority or jurisdiction of the agency . . . made upon lawful procedure, and . . . not affected by other error of law."[60]

139.  On April 4, 2025, a majority of a three-judge panel of the North Carolina Court of Appeals issued a decision reversing the Wake County Superior Court's affirmance of the NCSBE's dismissal of Griffin's protests.[61]

140.  Consistent with NCSBE's *England* reservation, the majority's decision did not address the NCSBE's federal law arguments.[62]

141.  As a threshold matter, the majority concluded that the NCSBE did not have the authority to require Griffin to provide notice to the voters whose ballots he was challenging during prior administrative proceedings and that, regardless, Griffin provided adequate notice by sending

---

[59] *Id.* at 11.

[60] *See* Order, *Griffin v. N.C. State Bd. Elections*, No. 24CV040619-910 (Wake Cnty. Sup. Ct. Feb. 7, 2025), https://perma.cc/X9Z2-EBCW; Order, *Griffin v. N.C. State Bd. Elections*, No. 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 7, 2025), https://perma.cc/9G8N-DKSC; Order, *Griffin v. N.C. State Bd. Elections*, No. 24CV040622-910 (Wake Cnty. Sup. Ct. Feb. 7, 2025), https://perma.cc/MSJ8-7LYD.

[61] *See Griffin v. N.C. State Bd. Elections*, No. COA25-181 (Apr. 4, 2025), https://perma.cc/264D-U84T.

[62] *Id.*

27

some targeted voters (or a current resident at the voters' on-file address) the postcard with a QR code.[63]

142. With respect to voters challenged by Griffin due to their allegedly incomplete voter registration records, the majority concluded that, under state law, "any voter who registered since the adoption of N.C. Gen. Stat. § 163-82.4(a)(11), but who failed to provide their drivers license number or their social security number's last four digits or, in the absence thereof, otherwise was not properly assigned a unique number by the [NCSBE], is not lawfully registered to vote in North Carolina elections."[64]

143. With respect to overseas civilian and military voters challenged by Griffin for voting absentee without submitting a copy of their photo ID, the majority concluded that, under state law, "all voters voting absentee in a non-federal election in North Carolina [must] comply with the photo ID requirement" contained in Article 20 of the North Carolina General Statutes, including voters who voted in accordance with the provisions of Article 21A.[65]

144. The majority remanded the case to the Superior Court with further instructions to remand to the NCSBE to initiate a "cure" process for voters whose votes were being presumptively invalidated by its order.[66] The majority did not define how the "cure" process was to be conducted or what safeguards would need to be put in place to protect eligible voters' constitutional rights.[67]

145. Instead, the majority instructed the NCSBE to "immediately direct the county boards in all one hundred counties to expeditiously identify the challenged 'Incomplete Voter Registration' voters and notify said voters of their registration defects, to allow said voters fifteen

---

[63] *Id.* at 12-16.
[64] *Id.* at 24-25.
[65] *Id.* at 29.
[66] *Id.* at 33-36.
[67] *Id.*

(15) business days from the mailing of the notice to cure the defect, and upon verification to include in the count of this challenged election the votes of those voters who timely cure their registration defects and to omit from the final count the votes of those voters who fail to timely cure their registration defects."[68]

146. The majority also instructed the NCSBE to "immediately direct the county boards to expeditiously identify the military and overseas voters challenged under this protest and notify said voters of their failure to abide by the photo ID requirement or equivalent, to allow said voters fifteen (15) business days from the mailing of the notice to cure the defect, and upon verification, to include in the count of this challenged election the votes of those voters who timely cure their failure to abide by the photo ID requirement and to omit from the final count the votes of those voters who fail to timely cure their deficiencies."[69]

147. As a result, the majority ordered the NCSBE to presumptively invalidate all votes cast by (1) voters who registered to vote in state elections after 2004 whose entries in the NCSBE voter registration database are missing a driver's license number, the last four digits of their social security number, or a unique identifier issued by the NCSBE; and (2) overseas civilian and military voters who voted absentee in Guilford County, and potentially also Durham, Forsyth, and Buncombe Counties.[70] Unless these voters take further actions above and beyond what they were

---

[68] *Id.* at 35.

[69] *Id.* at 36. The dissenting judge read the majority's opinions to only apply to challenged overseas civilian and military voters who voted absentee in Guilford County (and not those challenged in Durham, Forsyth, and Buncombe Counties). *See id.* at 38 n.14 (Hampson, J., dissenting). However, the majority's instructions to direct the "county boards" to "identify the military and overseas voters challenged under this protest" indicates that the order applies to challenged voters in all four counties, given the that "[a]t the time of [Griffin's initial] protest, Guilford County had provided a list of such voters, which was included in the protest." *Id.*

[70] The dissenting judge read the majority's opinions to only apply to challenged overseas civilian and military voters who voted absentee in Guilford County (and not those challenged in Durham, Forsyth, and Buncombe Counties). *See id.* at 38 n.14 (Hampson, J., dissenting). However, the majority's instructions to direct the "county boards" to "identify the military and overseas voters challenged under this protest" indicates that the order applies to challenged voters in all four counties, given the that "[a]t the time of [Griffin's initial] protest, Guilford County had provided a list of such voters, which was included in the protest." *Id.* (Hampson, J., dissenting).

29

required to do to lawfully register and vote at the time of the 2024 elections, their votes will not be counted in deciding the Seat Six race.

148. The North Carolina Court of Appeals mandate for this decision was scheduled to issue on April 7, 2025 at 5:00PM.

149. On Sunday, April 6, Riggs and the NCSBE immediately appealed and sought a stay.

150. On April 7, the North Carolina Supreme Court stayed the North Carolina Court of Appeals' mandate.

151. On April 11, a 4-2 majority of the Supreme Court upheld the court of appeals order that presumptively disenfranchised Plaintiffs and the putative class of UMOVA List voters. Order at 6, *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3 (N.C. Apr. 11, 2025).

152. The Court unanimously reversed with respect to the voters who purportedly lack driver's license or the last four digits of their social security number in their public-facing voter file, permitting those votes to count as cast for this election. *Id.*

153. The majority dissolved the stay, denied further review, and adjusted the court of appeals' invented "verification" period by "expanding the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice" from election officials. *Id.*

154. Two justices dissented concerning the sets of military and overseas voters, both noting the grave federal constitutional concerns with the NCSBE implementing the Supreme Court majority's ordered relief.

155. The order presumptively invalidates the votes cast by UMOVA List voters whom Griffin targeted, as identified in the North Carolina Court of Appeals' majority opinion. The NCSBE will now carry out the order to discard their votes unless these voters are able to provide

"verification" to the satisfaction of their county board of elections through the forthcoming "cure" process.

156.  Votes cast by these voters in other state and federal elections appearing on the 2024 general election ballot have not been presumptively invalidated.

157.  The NCSBE has never conducted a post-election "cure" process of the kind it has been ordered to undertake by the North Carolina Court of Appeals.

158.  The verification process to come will impose significant burdens on the rights of putative Class members.

159.  The verification process to come will drain and require diverting the LWVNC's organizational resources, including from its other voter educational programs, to instead help stand up and implement campaigns to assist members and other affected voters to ensure that they can save their vote from invalidation.

160.  There is no provision of state or federal law authorizing such a "cure" process.

161.  There is no provision of state or federal law prescribing how such a "cure" process should be conducted.

162.  On information and belief, no state has ever required its election officials to presumptively invalidate and invent a cure process in a statewide election, much less one that disenfranchises up to thousands of already cast and counted votes.

163.  Under the terms of the orders of the North Carolina Court of Appeals and Supreme Court, the NCSBE has presumptively invalidated votes cast by overseas civilian and military voters who voted absentee in Guilford and, possibly, in Durham, Forsyth, and Buncombe Counties.

164.  First, here are the 1,409 UMOVA ballots cast in Guilford County, whom Griffin initially protested by the protest filing deadline.

165. Second, Griffin later sought to "supplement" that protest after the deadline by additionally challenging overseas and military ballots in Durham (1,991), Forsyth (1,014), and Buncombe Counties (1,095).

166. The precise scope of the Court of Appeals order, as revised by the Supreme Court, is unclear as to whether the affected voters are only in Guilford or also the other three counties in Griffin's supplement.

167. It is clear that, because Griffin challenged the UMOVA List Class's votes in up to these four counties, but not votes cast by overseas civilian and military voters who voted absentee in any of North Carolina's other 96 counties, the NCSBE will discard votes from some voters but not similarly situated others.

168. The NCSBE, under the terms of the order of the North Carolina Court of Appeals as affirmed by the North Carolina Supreme Court, will soon "direct the county boards to expeditiously identify . . . and notify" affected voters that their votes in the Seat 6 election will not count and provide them with an opportunity to provide "verification" to save their vote.[71]

169. As such, these questions will be left to the discretion of the individual affected county boards of elections.

170. Among the risks of non-uniformity, there is not a standard statewide method of (1) identifying which voters are at risk of disenfranchisement; (2) providing notice to these affected voters, many of whom are living overseas or serving in the military; and (3) determining how affected voters can provide the "verification" necessary to ensure their votes are counted in the Seat Six election.

---

[71] *Id.* at 34-35.

171. There is not a uniform statewide method of validating the results of this "cure" process as determined by each of the individual county boards of elections.

172. There is not a uniform statewide method of ensuring that voters who may disagree with their inclusion in the group of voters whose votes have been presumptively invalidated, or who may disagree with an individual county board of elections' refusal to accept their verification of lawful voting status, to dispute these determinations.

173. There is not a uniform statewide method of ensuring that voters who do not receive notice from their individual county boards of election have an opportunity to protect their fundamental right to vote prior to being disenfranchised at the end of the thirty-day "cure" period.

174. There is not a uniform statewide method of determining how to reach affected voters who have moved since casting their ballots in the Seat Six election to notify them of the thirty-day "cure" period.

175. There is not a uniform statewide process for reaching affected voters who are deployed in military service, hospitalized, or away from home due to business or family obligations to notify them of the thirty-day "cure" period.

176. There is not a uniform statewide method of determining how to count votes cast by voters who have died since casting their ballots in the Seat Six election.

177. For example, it has been reported that at least one UMOVA List voter has passed away since casting her vote in November.[72]

178. There is no process or policy for accounting for how these voters, whose votes were timely and must count, will go through the "cure" process.

---

[72] Rusty Jacobs, *Military veterans in the state legislature demand Griffin concede*, WUNC (Feb. 5, 2025), https://perma.cc/S9HW-KA6J.

179. Under the NCSBE's "cure" process, eligible voters who were qualified by the state to vote in the Seat Six election, and who cast their ballots in accordance with the rules in place at the time of and prior to that election, will be required to expend resources and undertake additional actions in order to have their votes counted in the Seat Six election. At a minimum, affected voters will now have to provide additional information to their county board of elections, in accordance with whatever process their individual board has put in place to allow voters to complete their "verification."

180. Neither Griffin nor any of the numerous other parties who brought pre-or post-election administrative claims or lawsuits seeking to disqualify overseas civilian and military voters provided any evidence that a single voter who cast their ballot under the UMOVA process for absentee voting is ineligible to vote or was not lawfully registered to vote in state elections prior to the 2024 Seat Six election.

## CLASS ACTION ALLEGATIONS

181. Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) of a class of eligible North Carolina voters who registered and voted in the 2024 Seat Six general election in accordance with the rules in place prior to and at the time of the election. The votes cast by these voters have been presumptively invalidated by the NCSBE and are at imminent risk of being discarded.

182. The putative class, the "UMOVA List Class," includes all registered voters who cast their votes, and had their votes counted, in the 2024 general election for Seat Six on the North Carolina Supreme Court and whose votes were challenged by Griffin in his protest to the NCSBE on the basis that they did not provide a copy of their photo identification when voting absentee. Such voters are those voting in Buncombe, Durham, Forsyth, and Guilford Counties.

34

183. Defendants can identify all members of the proposed Class.

184. Plaintiffs Conley, Webb, and Kromm are members and representatives of the proposed UMOVA List Class.

185. The requirements of Federal Rule of Civil Procedure 23(a) are satisfied.

186. *Numerosity*: The proposed Class is so numerous that joinder of all its members is impracticable. Based on current figures, the number is between 1,409 (only Guilford) and 5,509 (all four counties) voters who are members of the proposed UMOVA List Class, all of whose votes in the Seat Six election are at risk of being discarded by the NCSBE.[73]

187. *Commonality*: The claims of all members of the proposed Class depend upon "[a] single common question . . . of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the[ir] claims in one stroke.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Among other common issues, if this Court concludes that the U.S. Constitution forbids retroactively applying state law to disenfranchise an arbitrary set of voters who the state qualified to vote under the rules in place at the time of the 2024 election, then all members of the proposed Class are entitled to relief.

188. *Typicality*: The named Plaintiffs' claims are typical of the claims of the proposed Class. Like all members of the proposed Class, Plaintiffs registered to vote in North Carolina state elections in accordance with the rules maintained by the state at the time they registered, were qualified by the state to vote in the 2024 Seat Six election, voted in the 2024 Seat Six election in accordance with the rules maintained by the state at the time they voted, and have had their votes

---

[73] *See* Decision and Order at 3, *In re Election Protests of Jefferson Griffin, Ashlee Adams, Frank Sossamon, and Stacie McGinn*, N.C. State Bd. Elections (Dec. 13, 2024), https://perma.cc/M6GJ-MBSC.

presumptively invalidated due to the NCSBE's retroactive and arbitrary application of changes in election procedures to the 2024 Seat Six election.

189. *Adequacy*: The class representatives and class counsel will fairly and adequately protect the interests of the proposed Class. The class representatives are committed to obtaining declaratory and injunctive relief that will benefit themselves and the proposed class by reversing the NCSBE's unlawful attempt to retroactively and arbitrarily apply a change in election procedures to discard ballots they lawfully cast in the 2024 Seat Six election. They have a strong personal interest in the case and have no conflicts with class members. Named Plaintiffs are represented by experienced counsel who have expertise in voting rights and class action litigation.

190. The requirements of Rule 23(b)(2) are also satisfied. Defendants have acted on grounds that apply generally to the Class, such that the requested injunctive relief and / or corresponding declaratory relief is appropriate for the Class as a whole. The injunctive relief sought will preclude Defendants' unlawful disenfranchisement of all members of the Class in the 2024 Seat Six general election, ensuring that all Class members' votes will be counted, and counted equally, in determining the lawful winner of the Seat Six election.

## CLAIMS FOR RELIEF

### Count One
### Violation of the Fourteenth Amendment to the U.S. Constitution
### (Fundamentally Unfair Election Procedure Violating Due Process)
### 42 U.S.C. § 1983

191. The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

192. The Due Process Clause of the Fourteenth Amendment prohibits retroactively disenfranchising voters who registered and voted in accordance with the rules as maintained by election officials at the time of an election, because doing so "reaches the point of 'patent and

36

fundamental unfairness.'" *Hendon*, 710 F.2d at 182 (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)).

193.  In assessing whether a retroactive application of a post-election change in election rules is patently and fundamentally unfair, courts consider the "likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the [challenged] election" and whether "significant disenfranchisement [will] result[]" from the change. *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998) (distilling caselaw).

194.  Plaintiffs and all members of the proposed Class registered to vote at some time prior to the 2024 elections in accordance with the rules and requirements as maintained and enforced by Defendants and other election officials prior to and during the 2024 Seat Six general election.

195.  Plaintiffs and all members of the proposed Class were qualified and confirmed by Defendants and other election officials as registered voters under the rules and requirements as maintained and enforced by Defendants and other election officials prior to and during the 2024 Seat Six general election.

196.  Plaintiffs and all members of the proposed Class timely cast their ballots in the 2024 Seat Six general election in accordance with the rules and requirements as maintained and enforced by Defendants and other election officials prior to and during the 2024 Seat Six general election.

197.  Plaintiffs and all members of the proposed Class justifiably relied on Defendants and other election officials to maintain and enforce rules and procedures for voting in state elections which complied with state law.

198.  Plaintiffs and all members of the proposed Class justifiably relied on Defendants and other election officials instructing them that they were eligible to vote in state elections, including

the Seat Six election, and that they could do so via electronic transmission without also including a photocopy of the voter ID.

199.  Defendants are ordered to presumptively invalidate votes in the 2024 Seat Six general election cast by Plaintiffs and all members of the proposed Class.

200.  Defendants will imminently discard the votes cast by Plaintiffs and all members of the proposed Class in the 2024 Seat Six general election, based solely on the retroactive application of a state court decision issued five months after the 2024 election interpreting state law in a way that changes the rules and requirements for elections from the rules and requirements as maintained and enforced by Defendants and other election officials prior to and during the 2024 Seat Six general election.

201.  The only way Plaintiffs and all members of the proposed Class can avoid being disenfranchised is if they provide "verification" that their votes in the Seat Six election were lawfully cast above and beyond what was required prior to and at the time of the Seat Six election, through a to-be-invented "cure" process administered independently by each of the affected county board of elections, which provides Plaintiffs and members of the Class with no opportunity to dispute the boards' ultimate determination as to whether their votes will count.

202.  Defendants' actions erode the democratic process by throwing out the results of an election only after all votes in that election have been cast and counted under the rules in place at the time of the election.

203.  Defendants' retroactive application of novel election rules, which will imminently result in the disenfranchisement of Plaintiffs and all members of the proposed Class—who did everything required of them by the state to register and vote in the 2024 Seat Six general election—is patently and fundamentally unfair.

204. Alternatively, and additionally, Defendants' imposition of additional burdens on Plaintiffs and all Class members to have their votes counted in the Seat Six election—burdens which voters were not required to meet at the time of the Seat Six election, and which Defendants have not imposed on other similarly situated voters—is patently and fundamentally unfair.

205. Significant disenfranchisement will result because between 1,409 and 5,509 voters are set to be presumptively disenfranchised.

206. As a result of Defendants' refusal to count their votes equally as all other votes cast in the 2024 Seat Six election, in accordance with the rules and procedures in place at the time of the 2024 Seat Six election, Plaintiffs and all members of the proposed Class have suffered and will continue to suffer an irreparable injury in the form of a deprivation of their fundamental right to vote. *See N. Carolina State Conf. of the NAACP v. N. Carolina State Bd. of Elections*, 2016 WL 6581284, at *8 (M.D.N.C. Nov. 4, 2016) ("Denying an eligible voter her constitutional right to vote and to have that vote counted will always constitute irreparable harm.").

207. Moreover, the additional burdens—especially for UMOVA List voters—of completing the verification or cure process imposes irreparable injury.

208. On information and belief, many of the affected overseas and military voters in the Class will not successfully go through the "verification" process to save their vote.

209. Voters are less tuned into the election at this time, five months after the election has occurred, than they were at the time they voted.

210. In particular, overseas voters are less likely to be easily reached by election officials or aware of the need to look for a notice about the state of their ballot.

211. The state has no legitimate interest, let alone a compelling interest, in retroactively applying new election rules to presumptively disenfranchise thousands of qualified voters. The

steps NCSBE has been ordered to take are not narrowly or sufficiently tailored to achieve any such interest Defendants may claim.

212. Defendants are acting under color of state law in selectively enforcing patently and fundamentally unfair changes to the electoral system which will imminently disenfranchise Plaintiffs and all members of the Class.

213. Plaintiffs and all other members of the proposed Class have no adequate remedy at law other than the judicial relief sought here.

**Count Two**
**Violation of the First and Fourteenth Amendments to the U.S. Constitution**
**(Denial of the Fundamental Right to Vote)**
**42 U.S.C. § 1983**

214. The First and Fourteenth Amendments to the U.S. Constitution protect the fundamental right of Plaintiffs' and all members of the proposed Class to vote in state elections, including the 2024 Seat Six general election. *See, e.g.*, *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 229 (4th Cir. 2014).

215. This fundamental right to vote "necessarily includes the right to have one's vote counted and counted at its full worth." *United States v. Weston*, 417 F.2d 181, 183 (4th Cir. 1969); *see also Hendon*, 710 F.2d at 180 ("The Constitution protects the right of qualified citizens to vote and to have their votes counted as cast.").

216. To assess whether a law burdening the fundamental right to vote is unconstitutional, courts "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428, 438 (1992).

217. The character and magnitude of the burden on Plaintiffs' and every other member of the proposed Class's right to vote is severe because Defendants are poised to wholly disenfranchise

40

them in the 2024 Seat Six election unless they can comply with an unprecedented and dis-uniform "cure" process. *See, e.g.*, *Ayers-Schaffner v. DiStefano*, 860 F. Supp. 918, 921 (D.R.I.), *aff'd*, 37 F.3d 726 (1st Cir. 1994) ("[T]he United States Supreme Court has viewed any substantial disqualification of otherwise eligible voters to constitute a severe restriction" on the right to vote) (collecting cases).

218.  Under the *Anderson-Burdick* test, regulations that impose a severe burden on the right to vote must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434; *see also Fusaro v. Cogan*, 930 F.3d 241, 257-58 (4th Cir. 2019) ("When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened. If so, strict scrutiny applies.").

219.  The state has no legitimate interest, let alone a compelling interest, in refusing to count votes cast by voters whom the state itself qualified to vote in the 2024 Seat Six election and who complied with all applicable rules and requirements in place prior to and during that election. *See, e.g.*, *Thomas v. Andino*, 613 F. Supp. 3d 926, 952-53 (D.S.C. 2020).

220.  Indeed, the voters whose votes have been presumptively invalidated are only at risk of disenfranchisement because of the candidate's selective targeting of only some counties because, on information and belief, of how the voters there are anticipated to have voted. This fails even rational basis review.

221.  Alternatively, and additionally, Defendants' imposition of additional burdens on Plaintiffs and all Class members to have their votes counted in the Seat Six election—burdens which voters were not required to meet at the time of the Seat Six election, and which Defendants have not imposed on other similarly situated voters—is an undue burden on the fundamental right to vote.

41

222. As a result of Defendants' refusal to count their votes equally as all other votes cast in the 2024 Seat Six election, in accordance with the rules and procedures in place at the time of the 2024 Seat Six election, Plaintiffs and all members of the proposed Class have suffered and will continue to suffer an irreparable injury in the form of a deprivation of their fundamental right to vote. *See N. Carolina State Conf. of the NAACP*, 2016 WL 6581284, at *8 ("Denying an eligible voter her constitutional right to vote and to have that vote counted will always constitute irreparable harm.").

223. Defendants are acting under color of state law in selectively enforcing patently and fundamentally unfair changes to the electoral system which will imminently disenfranchise Plaintiffs and all members of the Class.

224. Plaintiffs and all other members of the proposed Class have no adequate remedy at law other than the judicial relief sought here.

**Count Three**
**Violation of the Fourteenth Amendment to the U.S. Constitution**
**(Equal Protection Clause)**
**42. U.S.C. § 1983**

225. The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

226. The Fourteenth Amendment to the U.S. Constitution provides in relevant part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

227. Under the Equal Protection Clause, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam); *see also Gallagher v.*

*New York State Bd. of Elections*, 477 F. Supp. 3d 19, 46 (S.D.N.Y. 2020) (stating that the Equal Protection Clause forbids "[t]he inconsistent treatment of ballots that were timely cast").

228. Plaintiffs' and all members of the proposed Class registered and voted in the 2024 Seat Six election in accordance with the rules in place at the time of the election.

229. Defendants' imminent discarding of only the subset of ballots challenged by Griffin in this statewide race, and not votes cast by other voters who fall into exactly the same categories as Plaintiffs and all members of the Class, results in the "arbitrary and disparate treatment in the valuation of one person's vote in relation to another's" in violation of the Equal Protection Clause. *Wise*, 978 F.3d at 100.

230. Defendants' imminent disenfranchisement of Plaintiffs and all UMOVA List Class members violates equal protection because the justification for discarding their votes applies equally to all overseas civilian and military voters statewide who voted absentee without providing a copy of their photo ID. There is no legitimate justification for distinguishing between votes cast by this group of voters for a statewide race in four predominantly Democratic counties and votes cast by the same group of voters in all other counties.

231. Alternatively, and additionally, Defendants' imposition of additional burdens on Plaintiffs and all Class members to have their votes counted in the Seat Six election—burdens which voters were not required to meet at the time of the Seat Six election, and which Defendants have not imposed on other similarly situated voters—results in arbitrary and disparate treatment in violation of equal protection.

232. As a result of Defendants' refusal to count their votes equally as all other votes cast in the 2024 Seat Six election, in accordance with the rules and procedures in place at the time of the 2024 Seat Six election, Plaintiffs and all members of the proposed Class have suffered and will

continue to suffer an irreparable injury in the form of a deprivation of their fundamental right to vote. *See N. Carolina State Conf. of the NAACP*, 2016 WL 6581284, at *8 ("Denying an eligible voter her constitutional right to vote and to have that vote counted will always constitute irreparable harm.").

233. Defendants are acting under color of state law in selectively enforcing patently and fundamentally unfair changes to the electoral system which will imminently disenfranchise Plaintiffs and all members of the Class.

234. Plaintiffs and all other members of the proposed Class have no adequate remedy at law other than the judicial relief sought here.

**Count Four**
**Violation of the Fourteenth Amendment to the U.S. Constitution**
**(Procedural Due Process)**
**42 U.S.C. § 1983**

235. The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

236. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the State of North Carolina from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

237. Plaintiffs and all members of the proposed Class have protected liberty interests under the First and Fourteenth Amendments to the U.S. Constitution in voting, and having their votes counted, in the Seat Six general election. *See, e.g.*, *Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020). Discarding their votes threatens this liberty interest.

238. Plaintiffs and all members of the proposed Class were entitled to adequate notice and a predeprivation opportunity to be heard prior to any action which would effectuate a deprivation

44

of their constitutional liberty interest in voting, and having their votes counted, in the Seat Six election. *See, e.g.*, *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.") (internal quotation marks omitted).

239. "[S]ufficient predeprivation process is the constitutional imperative" in circumstances such as these where eligible voters have had their fundamental right to vote presumptively invalidated. *Democracy N. Carolina*, 476 F. Supp. 3d at 226 (citation omitted).

240. Plaintiffs and all members of the proposed Class did not receive constitutionally adequate notice or an opportunity to be heard during electoral protest proceedings adjudicated by Defendants because Griffin's manner of effectuating service to challenged voters was deficient.

241. None of the targeted voters received adequate notice from Defendants (or anyone acting at the direction of Defendants or from anyone else acting on behalf of the State of North Carolina) that their protected liberty interests were at risk of deprivation.

242. The failure to provide Plaintiffs and all members of the proposed Class with notice and a predeprivation opportunity to be heard was not cured by or during any state court proceeding, because voters were not provided any notice or opportunity to be heard in any state court proceeding either.

243. As a result of Defendants' failure to provide adequate notice and a predeprivation opportunity to be heard in proceedings which has resulted in the deprivation of their constitutional liberty interest, Plaintiffs have suffered an irreparable injury under the Due Process Clause of the Fourteenth Amendment.

244. This injury cannot be remedied, and instead will be exacerbated, by the invented postdeprivation requirement that Plaintiffs and all members of the proposed Class now provide "verification" that their votes were lawfully cast.

245. The inadequate post hoc procedures will amount to an unprecedented, dis-uniform, and truncated "cure" process that will be administered independently by different individual county boards of elections and conducted without sufficient established statewide procedures.

246. Moreover, the postdeprivation process provides no established, uniform, constitutionally adequate opportunity to contest an adverse result.

247. Defendants acted under color of state law in failing to afford Plaintiffs adequate notice and opportunity to be heard.

248. Plaintiffs have no adequate remedy at law other than the judicial relief sought here.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that Defendants' retroactive presumptive invalidation of the votes cast by Plaintiffs and all members of the proposed Class in the 2024 Seat Six election and discarding of their votes is unlawful in violation of the First and Fourteenth Amendments to the U.S. Constitution;

B. Enjoin Defendants and their agents from retroactively applying the post-election changes in election procedures to the 2024 Seat Six election to presumptively invalidate, discard, encumber, or otherwise not count the votes cast by Plaintiffs and all other members of the proposed Class in that election;

C.  Enjoin Defendants and their agents from requiring Plaintiffs and all other members of the proposed Class to provide additional "verification" that their votes were lawful in order for those votes to be counted in the 2024 Seat Six election, and issue related declaratory relief;

D.  Enjoin Defendants and their agents from certifying Jefferson Griffin as the winner of the 2024 Seat Six election, and issue related declaratory relief;

E.  Order Defendants to certify the winner of the election for Seat Six on the Supreme Court of North Carolina based on the statewide canvass of results following the recounts previously completed by Defendants;

F.  Declare and order all necessary relief—including under the All Writs Act, 28 U.S.C. § 1651(a), and applicable federal law—that any pending state court order inconsistent with the federal relief ordered herein is void and unenforceable going forward;

G.  Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bringing this lawsuit pursuant to and in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b);

H.  Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

I.  Grant other and further relief as the Court may deem just and proper.


Dated: April 14, 2025                              Respectfully Submitted,

                                                   /s/ *Jessica A. Marsden*
                                                   Jessica A. Marsden

                                                   Jessica A. Marsden
                                                   Protect Democracy Project
                                                   510 Meadowmont Village Circle, No. 328
                                                   Chapel Hill, NC 27517
                                                   jess.marsden@protectdemocracy.org

47

Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 50855

Anne Harden Tindall
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
anne.tindall@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 31569

Samuel Jacob Davis
Election Law Clinic at Harvard Law School
6 Everett Street,
Cambridge, MA, 02138
Telephone: (631) 807-2327
State Bar No. 57289

Hayden Johnson*
Protect Democracy Project
2020 Pennsylvania Avenue NW, Suite #163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

John Paredes*
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
john.paredes@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

Stacey Leyton*
Danielle Leonard*
Juhyung Harold Lee*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
dleonard@altber.com

48

hlee@altber.com

*Notice of special appearance forthcoming*