# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

CARRIE CONLEY, LOCKHART WEBB,
and ELLA KROMM, individually and on
behalf of all others similarly situated;
GABRIELA ADLER-ESPINO; and THE
LEAGUE OF WOMEN VOTERS OF
NORTH CAROLINA,

*Plaintiffs,*

v.

ALAN HIRSCH, JEFF CARMON, STACY
"FOUR" EGGERS IV, KEVIN N. LEWIS,
and SIOBHAN O'DUFFY MILLEN, in their
official capacities as members of the North
Carolina State Board of Elections; and
KAREN BRINSON BELL, in her official
capacity as Executive Director of the North
Carolina State Board of Elections,

*Defendants.*

Case No. 5:25-cv-00193-M

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

**EMERGENCY HEARING AND ORAL
ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

I.    Plaintiffs are eligible, qualified voters who cast their votes in November 2024 according to North Carolina's settled voting rules for overseas and military voters.......... 3

II.    Justice Riggs wins the November 2024 Seat Six election, but Judge Griffin refuses to accept the results. ...................................................................................................... 6

III.   The 2024 election rules were well-established and repeatedly conveyed to voters. .......... 7

IV.   The NCSBE rightly rejects Griffin's post-election protests. ............................................. 9

V.    Griffin again contests the election results. ...................................................................... 10

VI.   North Carolina courts grant Griffin's unprecedented post-election request to change settled voting rules and subvert the democratic process. ................................................... 11

LEGAL STANDARD ............................................................................................................ 13

ARGUMENT ......................................................................................................................... 13

I.    Plaintiffs are likely to succeed on their constitutional claims............................................ 13

    A.    The NCSBE will violate voters' Substantive Due Process and voting rights.............. 14

    B.    Retroactive changes to the established rules that voters relied on to cast their votes violate due process. .......................................................................................................... 15

    C.    Disenfranchising voters for administrative error violates due process. ........................ 18

    D.    Presumptively invalidating votes violates Plaintiffs' right to vote. .............................. 19

    E.    The NCSBE is and will continue to violate equal protection by applying the new retroactive voting rules to only a subset of voters for no legitimate reason. ............... 21

II.    The equities strongly favor stopping the mass disenfranchisement Plaintiffs face. ......... 23

    A.    Absent injunctive relief, voters will suffer irreparable harm. ....................................... 23

    B.    Protecting voters' constitutional rights serves the public interest. ............................... 24

    C.    The balance of hardships strongly favors an injunction. ............................................... 25

CONCLUSION........................................................................................................................ 25

CERTIFICATE OF COMPLIANCE ....................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aggarao v. MOL Ship Mgmt. Co.*,
   675 F.3d 355 (4th Cir. 2012) ......................................................... 25

*Bennett v. Yoshina*,
   140 F.3d 1218 (9th Cir. 1998) .................................................. 15, 17

*Black v. McGuffage*,
   209 F. Supp. 2d 889 (N.D. Ill. 2002) ........................................... 20

*Briscoe v. Kusper*,
   435 F.2d 1046 (7th Cir. 1970) ...................................................... 17

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ...................................................................... 20

*Buscemi v. Bell*,
   964 F.3d 252 (4th Cir. 2020) ......................................................... 20

*Bush v. Gore*,
   531 U.S. 98 (2000) ......................................................... 20, 21, 23

*City of Greensboro v. Guilford Cnty. Bd. of Elections*,
   248 F. Supp. 3d 692 (M.D.N.C. 2017) ........................................ 22

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) ................................................................ 20, 23

*Democracy N.C. v. N.C. State Bd. of Elections*,
   476 F. Supp. 3d 158 (M.D.N.C. 2020) ........................................ 14

*Dunn v. Blumstein*,
   405 U.S. 330 (1972) ................................................................ 21, 23

*E. Enters. v. Apfel*,
   524 U.S. 498 (1998) ...................................................................... 15

*Gallagher v. N.Y. State Bd. of Elections*,
   477 F. Supp. 3d 19 (S.D.N.Y. 2020) ........................................... 22

*Gray v. Sanders*,
   372 U.S. 368 (1963) ................................................................ 19, 22

*Greidinger v. Davis*,
   988 F.2d 1344 (4th Cir. 1993) ...................................................... 20

*Griffin v. Burns*,
   570 F.2d 1065 (1st Cir. 1978) ................................................ *passim*

*Griffin v. N.C. State Bd. of Elections*,
   No. 25-1018 (4th Cir. Feb. 4, 2025) ............................................. 11

*Griffin v. N.C. State Bd. of Elections,*
 No. 320P24-3 (N.C. Apr. 11, 2025)...................................................................... 12

*Griffin v. N.C. State Bd. of Elections,*
 No. 5:24-cv-00724 (E.D.N.C. Jan. 6, 2025) ........................................................ 11

*Griffin v. N.C. State Bd. of Elections,*
 No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) ...................... 11

*Hendon v. N.C. State Bd. of Elections,*
 710 F.2d 177 (4th Cir. 1983) ..................................................... 2, 14, 15, 18

*Hoblock v. Albany Cnty. Bd. of Elections,*
 487 F. Supp. 2d 90 (N.D.N.Y. 2006)...................................................................... 18

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
 174 F.3d 411 (4th Cir. 1999) ................................................................................. 25

*Hunter v. Hamilton Cnty. Bd. of Elections,*
 635 F.3d 219 (6th Cir. 2011) ................................................................................. 21

*Kim v. Bd. of Ed. of Howard Cnty.,*
 93 F.4th 733 (4th Cir. 2024) ................................................................................. 23

*Landgraf v. USI Film Prod.,*
 511 U.S. 244 (1994)................................................................................................. 15

*LWV of N. Carolina v. North Carolina,*
 769 F.3d 224 (4th Cir. 2014) ................................................................. 13, 23, 24

*McLaughlin v. N.C. Bd. of Elections,*
 65 F.3d 1215 (4th Cir. 1995) ................................................................................. 20

*McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187, Cahokia, Ill.,*
 373 U.S. 668 (1963) ................................................................................................. 18

*Mi Familia Vota v. Fontes,*
 129 F.4th 691 (9th Cir. 2025) ............................................................................... 21

*N.C. State Conf. of NAACP v. McCrory,*
 831 F.3d 204 (4th Cir. 2016) ................................................................................. 23

*Ne. Ohio Coal. for Homeless v. Husted,*
 696 F.3d 580 (6th Cir. 2012) ....................................................................... 18, 19

*Newsom v. Albemarle Cnty. Sch. Bd.,*
 354 F.3d 249 (4th Cir. 2003) ................................................................................. 24

*Obama for America v. Husted,*
 697 F.3d 423 (6th Cir. 2012) ................................................................................. 24

*Phoenix v. Kolodziejski,*
 399 U.S. 204 (1970)................................................................................................. 14

*Pierce v. N.C. State Bd. of Elections,*
 97 F.4th 194 (4th Cir. 2024) ................................................................................. 24

iv

*Project Vote/Voting for Am., Inc. v. Long,*
   682 F.3d 331 (4th Cir. 2012) ................................................................. 9

*Purcell v. Gonzalez,*
   549 U.S. 1 (2006) ................................................................................. 24

*Reynolds v. Sims,*
   377 U.S. 533 (1964) ............................................................................. 14

*Roe v. Alabama,*
   43 F.3d 574 (11th Cir. 1995) ......................................................... 15, 17

*Slochower v. Bd. of Educ.,*
   350 U.S. 551 (1956) ............................................................................. 19

*United States v. Weston,*
   417 F.2d 181 (4th Cir. 1969) ............................................................... 19

*Winter v. Natural Res. Def. Council,*
   555 U.S. 7 (2008) ................................................................................. 13

*Wise v. Circosta,*
   978 F.3d 93 (4th Cir. 2020) ................................................................... 2

*Wright v. North Carolina,*
   787 F.3d 256 (4th Cir. 2015) ............................................................... 21

**Statutes**

28 U.S.C. § 1443 .................................................................................... 10

N.C.G.S. § 120-70.101 ............................................................................. 8

N.C.G.S. § 143B-30.1(a) ........................................................................... 8

N.C.G.S. § 150B-21.9(a) ........................................................................... 8

N.C.G.S. § 163-22 (2024) ......................................................................... 9

N.C.G.S. § 163-82.1(b) ............................................................................. 9

N.C.G.S. § 163-82.4(c)(1) ......................................................................... 9

N.C.G.S. § 163-82.7(a) ............................................................................. 9

N.C.G.S. § 163-82.11(d) ........................................................................... 9

N.C.G.S. § 163-182.14(b) ........................................................................ 10

N.C.G.S. § 163-226.3 ............................................................................... 9

N.C.G.S. § 163-230.1(f1) ......................................................................... 10

N.C.G.S. § 163-258.10 .......................................................................... 5, 8

N.C.G.S. § 163-258.11 ............................................................................. 5

N.C.G.S. § 163-258.13 ............................................................................. 8

N.C.G.S. § 163-258.2 ............................................................................................... 3, 5

N.C.G.S. § 163-258.4 ............................................................................................... 5, 9

N.C.G.S. § 163-258.15 ............................................................................................. 6, 10

N.C.G.S. § 163-258.17 ............................................................................................. 6, 9

N.C.G.S. § 163-258.30 ............................................................................................. 5, 9

N.C.G.S. § 163-272.1 ............................................................................................... 9

N.C.G.S. § 163-273 .................................................................................................. 9

N.C.G.S. § 163-274 .................................................................................................. 9

N.C.G.S. § 163-275 .................................................................................................. 9

## Regulations

08 N.C. Admin. Code § 17.0109(d) ........................................................................ 7

08 N.C. Admin. Code 17.0109 (2023) ................................................................... 8

08 N.C. Admin. Code 17.0109(d) (2019) .............................................................. 8

## Other Authorities

Fed. R. Civ. P. 65(c) ............................................................................................... 25

## INTRODUCTION

Plaintiffs represent a putative class of up to 5,509 registered military and overseas voters who voted in the 2024 general election for Seat Six on the North Carolina Supreme Court in accordance with the settled and widely communicated rules in place for the election. The State Board of Elections ("NCSBE") is ordered to presumptively invalidate the putative class's votes for that race, based solely on the retroactive application of a change in election rules articulated *over five months after* all votes were cast and counted. Plaintiffs seek immediate injunctive relief to maintain the status quo and prevent the NCSBE from denying thousands of qualified voters their fundamental rights.

Prior to and at the time of the 2024 election, election officials in North Carolina instructed military and overseas absentee voters, consistent with the widespread understanding of state election rules, that they were not required to attach a copy of their photo ID when casting their absentee ballot. This instruction was consistent with rules that military and overseas voters have followed for years. And it harmonized state and federal law by ensuring that covered voters who participate in state elections under the state Uniform Military and Overseas Voter Act ("UMOVA") process do so in ways that align with the rules for voting in federal races under federal law. These voters—the putative UMOVA List Class—justifiably relied on the repeated instructions that election officials gave regarding how to cast their votes, and were not even given the option to provide their ID when voting.

Now, however, the NCSBE has been ordered to reverse these instructions and apply the changed rules retroactively. The NCSBE has been ordered to declare all of the UMOVA List voters' votes presumptively invalid: their votes will be discarded unless, within 30 days, they can overcome significant additional hurdles not in place at the time of the election. To make matters

worse, the NCSBE is compelled to do so for *only a small, cherry-picked subset* of the identically situated affected voters, arbitrarily disenfranchising those residing in up to four counties that happened to favor the candidate who prevailed based on the results from November. In doing so, the NCSBE will presumptively disenfranchise a targeted subset of these voters because they, like everyone, reasonably failed to anticipatorily comply with post-election changes to election rules that directly contradict the clear instructions they received from their election officials.

Presumptively invalidating the UMOVA List Class's votes violates the U.S. Constitution in several ways. Due process and the fundamental right to vote prohibit changing the rules and imposing new requirements *after* an election to retroactively disenfranchise voters who followed the rules articulated at the time of an election because doing so "reaches the point of 'patent and fundamental unfairness.'" *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). And equal protection prohibits the "arbitrary and disparate treatment" of selectively applying these new ballot counting rules to a subset of voters but not others who are materially identical in all respects except for the county in which they are registered to vote. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam); *Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020).

Absent immediate intervention from this Court, the NCSBE will flagrantly violate Plaintiffs' federal due process, equal protection, and voting rights. The monthslong refusal to certify the election and count Plaintiffs' lawful votes, fully and equally, cannot go on. Because the law and the equitable factors decisively favor the voters, this Court should enjoin the NCSBE from taking further actions to presumptively invalidate (and ultimately discard) Plaintiffs' votes.

**BACKGROUND**

This case addresses a dangerous campaign to manipulate the results of an election. In the Seat Six race, the voters chose the incumbent, Justice Allison Riggs, over her opponent, state appellate Judge Jefferson Griffin. Multiple recounts confirmed Justice Riggs's victory. Rather than accept his loss, Griffin sued repeatedly. He asked the state courts to block certification, disavow the settled interpretation of state and federal election laws that had governed registration and voting prior to and on election day, and retroactively invalidate tens of thousands of votes cast by eligible, qualified voters—all to install himself on the state supreme court. The state has now acquiesced in part to Griffin's efforts to overturn his electoral defeat, without ever hearing from affected voters. Absent this Court's intervention, the NCSBE is poised to carry out its order to imminently disenfranchise Plaintiffs, and all members of the putative UMOVA List Class that they represent, in what would be an unprecedented subversion of the democratic process.

I.    **Plaintiffs are eligible, qualified voters who cast their votes in November 2024 according to North Carolina's settled voting rules for overseas and military voters.**

Plaintiffs voted in the Seat Six general election and represent the UMOVA List Class voters whom the NCSBE will imminently disenfranchise. Plaintiffs are eligible covered voters under the UMOVA definition. N.C.G.S. § 163-258.2(1). Specifically, they are either eligible North Carolina voters living overseas "who, before leaving the United States, was last eligible to vote in this State and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements," *id.* (1)(c), or "a spouse or dependent of a" "uniformed-service voter" as described in UMOVA, *see id.* (1)(a), (2), (6), (7). They include longtime registered voters who, for years, have relied on the instructions of their election officials to exercise their right to vote.

For example, Plaintiffs include voters on the UMOVA List who followed explicit guidance that they did not need to provide a photo ID when casting their absentee ballot. These voters are unquestionably eligible and otherwise qualified to vote.

Plaintiff Carrie Conley is a Guilford County voter whose husband is an active-duty U.S. Army soldier stationed in Vicenza, Italy. Ex. 1, Conley Decl. ¶¶ 4, 6. Plaintiff Conley voted using the military and overseas online portal to vote in the 2022 general election and then again in both the primary and general elections in 2024. *Id.* ¶ 8. Neither the instructions to request her overseas ballot nor the instructions to submit her ballot via the online portal directed or prompted her to provide a photocopy of her photo ID, and the online portal, to her knowledge, did not provide any means for submitting a photocopy of her ID. *Id.* ¶¶ 10-11.

Plaintiff Lockhart Webb is a Guilford County voter who voted overseas from Switzerland, where she was living with her husband while he completed his PhD. Ex. 2, Webb Decl. ¶¶ 5-8. Plaintiff Webb voted absentee by submitting a Federal Post Card Application then submitting her ballot through the online portal available to overseas voters. Neither the instructions for requesting her overseas ballot nor the instructions for submitting her ballot via the online portal directed or prompted her to provide a photocopy of her photo identification. *Id.* ¶¶ 9-12; *see also id.*, Exs. A, B.  Since the 2024 election, Plaintiff Webb left the address she voted at and is in the process of moving back to North Carolina. She is concerned that she will not receive notice and will be unable to verify her vote during the upcoming "cure" process because she will be in transit over the next few weeks. Webb Decl. ¶¶ 15-17.

Plaintiff Ella Kromm is a Durham County voter who, during her one-year position teaching English in Spain, voted via the portal maintained for overseas voters. Ex. 3, Kromm Decl. ¶¶ 7-

4

11. The online portal for UMOVA List voters did not provide any way to submit a copy of her photo ID.

Plaintiff League of Women Voters of North Carolina is a nonpartisan, grassroots, membership organization dedicated to encouraging informed and active participation in government and advocating for its members' rights to vote, many of whom have been targeted by Griffin's election protests. Ex. 4, Rubin Decl. ¶¶ 5-10. One such member is Alana Pierce. Pierce is a Buncombe County voter who, while completing her PhD at a university in Montreal, voted via the portal maintained for overseas voters. Ex. 5, Pierce Decl. ¶¶ 3-4. Pierce received instructions from the NCSBE on how to vote in the 2024 general election. Because the state online portal she used to vote did not provide her with any way to upload a copy of her photo ID, she reasonably believed the voter ID requirement did not apply. *Id.* ¶¶ 11-14, 17-21.

These UMOVA List voters are authorized to vote absentee using either the state UMOVA absentee voting process or the Federal Write-in Absentee Ballot to vote in federal and state elections. N.C.G.S. § 163-258.2(3) ("'Military-overseas ballot' means any of the following: . . . A federal write-in absentee ballot described in" UOCAVA and "A ballot specifically prepared or distributed for use by a covered voter"); *see also id.* § 163-258.11 ("A covered voter may use the federal write-in absentee ballot . . . to vote for all offices and ballot measures in a covered election"). The voted ballot can be returned by mail or online. *Id.* §§ 163-258.10 (describing "electronic transmission" voting process); 163-258.15 (same). The NCSBE oversees the online voting process for UMOVA voters. *Id.* §§ 163-258.4(c) (delegating oversight responsibility to NCSBE); 163-258.30(b) (same). When they transmit their ballot, UMOVA List voters must attest to their "identity, eligibility to vote, status as a covered voter, and timely and proper completion of an overseas-military ballot" on an Affirmation of Military-Overseas Voter. *Id.* § 163-258.4(e);

5

*id.* § 163-258.17(b) ("The declaration and any information in the declaration may be compared against information on file to ascertain the validity of the document."). That Affirmation comes with a warning of significant punishment to ensure voters are complying with the rules: "Each military-overseas ballot shall include or be accompanied by a declaration signed by the voter declaring that a material misstatement of fact in completing the document may be grounds for a conviction of perjury under the laws of the United States or this State." *Id.* § 163-258.13.

Plaintiffs are representative of the proposed UMOVA List class. Compl. ¶¶ 20-30. But the voters at risk of disenfranchisement are significantly skewed from the overall demographics of North Carolina voters and the full set of overseas and military voters. As Plaintiffs' Expert Dr. Christopher Cooper found, among the selectively protested UMOVA voters in North Carolina, Democratic voters are nearly five times as likely to have their votes presumptively invalidated compared to Republican voters. Ex. 6, Cooper Rep. at 3, 7, 10.

## II.    Justice Riggs wins the November 2024 Seat Six election, but Judge Griffin refuses to accept the results.

In November 2024, the people of North Carolina voted for Riggs to retain her seat on the state supreme court. After the initial count, Riggs prevailed by 625 votes. At Griffin's request, the NCSBE conducted a machine recount, which increased Riggs's margin to 734 votes. An additional partial hand recount again confirmed her victory. *See* Ex. 7, Johnson Decl. ¶¶ 10–11, Exs. I, J.

Griffin refused to accept this outcome. Instead, he filed over 300 election protests across the state seeking to negate over 65,000 votes. The NCSBE consolidated and took jurisdiction on November 20. *See* Johnson Decl. ¶ 10, Ex. I; *Griffin v. NCSBE*, No. 5:24-cv-00731 (E.D.N.C. 2024), ECF 1-4 at 2 (NCSBE Decision). As relevant here, Griffin protested the votes "cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form." *Id.* at 12. But in his campaign

to turn his electoral loss into a win, Griffin selectively targeted such voters in a few counties where the results showed Riggs had performed well. He sought information about UMOVA voters from six total counties: Guilford, Buncombe, Forsyth, Durham, Cumberland, and New Hanover. He then lodged a timely protest only to the 1,409 UMOVA ballots in Guilford County. *Id*. He later sought to "supplement" that protest after the deadline by additionally challenging UMOVA ballots in Durham (1,991), Forsyth (1,014), and Buncombe Counties (1,095). *Id.* & n.2.

Thus, Griffin targeted somewhere between 1,409 and 5,509 military and overseas voters in at most four of North Carolina's 100 counties. ECF 1-4 at 3. In doing so, he submitted no evidence that any voter was ineligible to vote, had done anything other than what election officials told them to do, or that any fraud or irregularity occurred in the Seat Six election. *Id.* at 24.

Before the election, neither Griffin nor anyone else challenged (administratively, legally, or otherwise) the formal rules election officials adopted and articulated to UMOVA voters. This includes the rule that these voters, because of their separate voting process prescribed in state and federal law, did not need to include a photocopy of their voter ID with their UMOVA ballot.

### III. The 2024 election rules were well-established and repeatedly conveyed to voters.

Plaintiffs cast their ballots following the well-established—and uncontested—rules for UMOVA voters. Based on settled understandings of state law for the 2024 election, election officials repeatedly told Plaintiffs and other UMOVA List voters that state and federal law allowed them to vote absentee (online or via mail), using a process specifically for military and overseas voters that did not require them to submit a photocopy of their voter ID. In particular:

- On April 1, 2024, NCSBE unanimously enacted a rule confirming that a new 2023 state law requiring a copy of photo ID for *domestic* absentee voters did not apply to the separate process for military and overseas voters. 8 N.C. Admin. Code § 17.0109(d); Johnson Decl. ¶ 2, Ex. A.

- In March 2024, the Rules Review Commission—composed of "10 members to be appointed by the General Assembly," whose purpose is to ensure that agency rules are "within the authority delegated to the agency" and "reasonably necessary to implement or interpret an

enactment of the General Assembly," N.C.G.S. §§ 143B-30.1(a), 150B-21.9(a)—unanimously approved NCSBE's rule. Johnson Decl. ¶ 3, Ex. B. The General Assembly's Joint Oversight Committee, which reviews agency rules that the Commission adopts, did not object. N.C.G.S. § 120-70.101.

▪ The NCSBE adopted the same instruction from a substantively identical temporary rule on August 2, 2023. *See* 08 N.C. Admin. Code 17.0109 (2023).

▪ This rule was an extension of materially the same instructions the NCSBE gave these voters and election officials back in August 2019. *See* 08 N.C. Admin. Code 17.0109(d) (2019).

▪ On the NCSBE's FAQ page for the November election, officials informed military and overseas voters: Q: "Is photo ID required for military and overseas voters (aka, UOCAVA voters)?" A "***No. Photo ID is not required for military or overseas voters*** who vote using special absentee voting procedures that federal law makes available for such voters." Johnson Decl. ¶ 4 (emphasis added).

▪ The NCSBE webpage about absentee voting made similar representations. *Id.* ¶¶ 5, 20.

▪ An August 25, 2024, email from the NCSBE counsel to all county elections directors explained that military and overseas voters did not need to provide photo ID. *Id.* ¶ 8.

▪ A September 4 email from NCSBE to county officials reiterated the same. *Id.* ¶ 7.

▪ The NCSBE online portal for overseas voting offered no opportunity or prompt to provide a copy of a photo ID. Johnson Decl. ¶ 6; Cooper Rep. at 5; N.C.G.S. §§ 163-258.10 (describing "electronic transmission" voting process); 163-258.15 (similar).

▪ UMOVA List voters can cast their ballot either under the state process or the Federal Write-in Absentee Ballot. *Supra* Part I. That federal option for voting in federal and state elections permits states to include additional instructions. But North Carolina did not include any instruction (or opportunity) for voters using Federal Write-in Absentee Ballot to provide a copy of a photo ID. Johnson Decl. ¶¶ 13, 21.

▪ The potentially affected counties likewise gave repeated instructions that UMOVA voters did not need to provide a copy of their photo ID, could vote using the using Federal Write-in Absentee Ballot that does not require a photocopy of ID, or otherwise distinguished the UMOVA absentee voting process from the requirements applicable to the general domestic civilian absentee process that includes the photocopy of ID requirement. *Id.*

Plaintiffs and similarly situated voters relied on election officials informing them that they were successfully registered and able to cast their ballot pursuant to these rules. *See, e.g.*, Webb Decl. ¶¶ 10-12; Kromm Decl. ¶¶ 8-12, 15, 21; Pierce Decl. ¶¶ 11-14; Conley Decl. ¶¶ 9-11.

This reliance was entirely reasonable: the NCSBE maintains and enforces state election rules, and county officials confirm and approve submitted votes. N.C.G.S. §§ 163-82.1(b), 163-82.7(a), 163-82.11(d). The NCSBE also issues rules and regulations that fill gaps and ensure that qualified voters who want to can vote, specifically to facilitate voting for overseas and military voters who must overcome unique challenges. *Id.* §§ 163-22(a)-(c) (2024) (generally delegating rulemaking responsibilities); 163-258.4 (delegating oversight responsibilities to NCSBE regarding UMOVA voters); 163-258.30 (same). Thus, election officials, not voters, are responsible for making sure that the voting rules are established and communicated to the public. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012).

Voters could also be assured that, under North Carolina's election rules, there are adequate safeguards to make sure only eligible North Carolinians can vote. All persons who register must affirm on the voter registration form that they meet all the qualifications to vote, under penalty of a Class I felony. N.C.G.S. § 163-82.4(c)(1). Eligible military and overseas voters who use the specified absentee voting process prescribed in federal and state law must establish their identity when they request to vote and then sign the Affirmation of Military-Overseas Voter attesting to their identity and eligibility. *Id.* §§ 163-258.4(e), 163-258.17(a)-(b). And, overall, any sort of voter fraud is a serious crime that is deterred with significant penalties. *See generally id.* §§ 163-272.1, 163-273, 163-274, 163-275, 163-226.3. These laws effectively protect the rights of eligible voters to participate while deterring and preventing unlawful voting.

## IV.    The NCSBE rightly rejects Griffin's post-election protests.

On December 13, 2024, the NCSBE rejected Griffin's election protests on factual, procedural, and legal grounds and ordered the race certified for Riggs. It concluded that Griffin failed to properly notify all challenged voters, who were mailed postcards containing only QR codes with links to a confusing website that did not adequately inform voters why they were

9

receiving such postcards or what they could do in response. *Griffin*, ECF 1-4 at 8-10. The NCSBE also concluded that Griffin's protests misconstrued state and federal law, failed to allege any facts demonstrating any voters' ineligibility, and relied on improper factual inferences. *Id*. at 15. Notably, it explained that there are requirements, under Article 20 of the election code, for domestic civilian voters to provide a photocopy of their voter ID when voting absentee. N.C.G.S. § 163-230.1(f1). But military and overseas voters eligible to vote under Article 21, and entirely separate process, were not under the same obligation. *Griffin*, ECF 1-4 at 35-36. Overall, the NCSBE ruled that "it would violate the federal constitution's guarantee of substantive due process to apply . . . a newly announced rule of law to remove voters' ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots." *Id*. at 39.

## V.     Griffin again contests the election results.

State law requires that, for state supreme court races, any appeal of an NCBSE election protest decision must be filed in state trial court. N.C.G.S. § 163-182.14(b). Nevertheless, on December 17, Griffin filed an original writ of prohibition in the North Carolina Supreme Court asking the very court he sought to join to stay certification of Riggs' victory and discard over 65,000 votes. Johnson Decl. ¶ 14, Ex. M. That petition also asked the Court to declare that discarding these voters' ballots would *not* violate federal laws or the U.S. Constitution. *Id*. Griffin subsequently filed additional cases in the state trial courts, advancing the same claims, and moved for preliminary injunctive relief asking to be installed as the winner.

The NCSBE immediately removed each of these cases to federal court. On January 6, 2025, the District Court found that the cases had been properly removed pursuant to 28 U.S.C. § 1443 but declined to exercise jurisdiction on *Burford* abstention grounds. Order at 8-26, *Griffin v. N.C. State Bd. of Elections,* No. 5:24-cv-00724 (E.D.N.C. Jan. 6, 2025), ECF 50. After an emergency

appeal, the Fourth Circuit affirmed the § 1443 ruling, modified the decision to apply *Pullman* abstention instead, and remanded to the District Court to retain federal jurisdiction over any federal issues in Griffin's claims not rendered moot by subsequent state court proceedings. Order at 5-11, *Griffin v. N.C. State Bd. of Elections*, No. 25-1018 (4th Cir. Feb. 4, 2025), ECF 132.

On January 7, 2025, immediately after receiving the remand, a divided North Carolina Supreme Court stayed certification of the race and ordered briefing on the merits of Griffin's writ. On January 22, reversing course, the Supreme Court remanded to the state trial courts, again by a divided vote. In so doing, the Court imposed an indefinite stay of certification pending resolution of the state cases. Following that remand, separate cases proceeded in the Wake County Superior Court challenging the NCSBE decisions with respect to the three categories Griffin continued to protest. No voters participated as parties in these cases. Consistent with the Fourth Circuit's order, the NCSBE reserved its right to have the federal courts resolve federal issues in the case. On February 8, the Superior Court held a daylong hearing and affirmed the NCSBE in all three cases.

## VI. North Carolina courts grant Griffin's unprecedented post-election request to change settled voting rules and subvert the democratic process.

Griffin appealed the superior court orders. On April 6, a divided panel of the Court of Appeals reversed the court's affirmance of the NCSBE's denial of Griffin's protests. *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025).

The majority held that, applying *only* state law considerations, overseas civilian and military voters who did not submit a copy of their photo ID when voting absentee did not lawfully cast their ballots. *Id*. at *12. This holding contravened the settled understanding of the voting rules as maintained, enforced, and communicated to voters by election officials at the time of the election. *See infra* Part III. Nevertheless, the majority concluded that votes cast by these voters

were presumptively invalid, but only in the Seat Six election. *Griffin v. N.C. State Bd. Of Elections*, No. COA25-181, 2025 WL 1021724, at *15.

The majority further held that the only way affected voters could have their votes counted was for them to provide additional "verification" to their county board of elections. *Id.* at *12. State law makes no provision for this makeshift "cure" process. Yet the majority instructed the NCSBE to "immediately direct the county boards" in the counties handpicked by Griffin for the UMOVA List voters, "to expeditiously" identify and notify affected voters that, unless they provided "verification" within fifteen days of receiving notice, their votes would be discarded. *Id*. Notably, the court of appeals' identification of "the counties" for UMOVA List voters is distinguished from the order that would have covered "all one hundred counties" in North Carolina for the separate challenge to the approximately 60,000 voters who purportedly lacked a driver's license or Social Security number in their voter file (which is not at issue here). *Id.* at *14. The majority did not articulate a uniform standard for how county boards should administer this "cure" process, nor did it provide voters with any mechanism to challenge their inclusion on the list of affected voters (or a county board's refusal to accept their "verification"), instead leaving it to the discretion of the individual county boards. *Id.*

On April 7, the North Carolina Supreme Court granted the NCSBE's and Riggs's unopposed motion to temporarily stay the court of appeals' mandate. Order at 1-2, *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3 (N.C. Apr. 11, 2025). Days later, on April 11, a 4-2 majority of the Supreme Court upheld the court of appeals order that presumptively disenfranchised Plaintiffs and the putative class of UMOVA List voters. *Id.* at 6. It dissolved the stay, denied further review, and adjusted the court of appeals' invented "verification" period by "expanding the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business

12

days to thirty calendar days after the mailing of notice" from election officials. *Id.* Shortly after, Plaintiffs filed suit on behalf of the putative UMOVA List Class to protect their fundamental rights.

## LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction because they are likely to "succeed on the merits" and "suffer irreparable harm in the absence of" such relief, "the balance of equities tips in [their] favor," and "an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *LWV of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

## ARGUMENT

Consistent with the orders of the North Carolina Court of Appeals and Supreme Court, the NCSBE has presumptively invalidated Plaintiffs' votes based on the retroactive application of novel interpretations of state law first articulated five months *after* their votes were cast and counted. Now, unless voters can satisfy additional burdens in an unprecedented "cure" process, the NCSBE will discard Plaintiffs' votes in the 2024 Seat Six race, disenfranchising them entirely. The U.S. Constitution forbids this unprecedented subversion of the democratic process, and the equities decisively favor the voters. Plaintiffs ask this Court to enjoin the NCSBE from discarding their votes and uphold their fundamental rights.

## I.     Plaintiffs are likely to succeed on their constitutional claims.

Presumptively invalidating Plaintiffs' votes infringes their constitutional rights in three ways pertinent here. First, the NCSBE is and will continue to violate Plaintiffs' due process rights by trampling voters' reliance interests, disenfranchising them based on administrative errors out of their control. Second, for similar reasons, the NCSBE is and will continue to violate Plaintiffs' fundamental right to vote by severely encumbering those rights despite the absence of any countervailing state interests. Third, the NCSBE is and will continue to violate Plaintiffs' equal protection rights by disenfranchising some affected voters, but not other *identically situated voters*,

13

with no legitimate basis for the differential treatment. Each violation is independently sufficient to support a preliminary injunction.

### A. The NCSBE will violate voters' Substantive Due Process and voting rights.

Plaintiffs are likely to succeed on their claims that, by presumptively invalidating their votes based on the retroactive application of new voting rules, the NCSBE is violating their due process rights. Plaintiffs' "constitutionally protected right to vote . . . and to have their votes counted" is fundamental and "of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964). It is a "constitutionally protected liberty interest" that the Due Process Clause guarantees. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020) (collecting cases). The constitutional prohibition on "the exclusion of otherwise qualified citizens from the franchise" applies in state elections just as much as in federal elections. *Phoenix v. Kolodziejski*, 399 U.S. 204, 209 (1970); *accord Reynolds*, 377 U.S. at 554.

Due process forbids the NCSBE from disenfranchising Plaintiffs and others because doing so will take "the election process [to] the point of 'patent and fundamental unfairness'" in a manner that "erodes the democratic process." *Hendon*, 710 F.2d at 182 (quoting *Burns*, 570 F.2d at 1077). The NCSBE's actions violate due process for two independently sufficient reasons. First, due process forbids applying changes to the voting rules that were in effect during an election to retroactively discard votes cast and counted under the then-settled rules. Voters' well-founded reliance interests in following the widely communicated rules for this election must be upheld. Second, due process prohibits election officials from disenfranchising voters due to the newly apparent administrative errors that election officials themselves made.

/ /

/ /

**1. Retroactive changes to the established rules that voters relied on to cast their votes violate due process.**

The NCSBE has been ordered to retroactively apply a novel interpretation of state law changing the state's election rules, directly contrary to the settled understanding of what those rules were at the time of the 2024 election, to presumptively disenfranchise voters who followed those rules. This violates Plaintiffs' substantive due process rights under the *Griffin v. Burns* framework, which prohibits the "retroactive invalidation" of Plaintiffs' votes. 570 F.2d at 1080. This framework—"settled" law in the Fourth Circuit—applies when state officials change the rules of an election after it has occurred and apply the changes to past votes. *Hendon*, 710 F.2d at 182. It is rooted in the Due Process Clause's "antiretroactivity principle": the government must "give[] people confidence about the legal consequences of their actions," and "settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265-66 (1994); *accord E. Enters. v. Apfel*, 524 U.S. 498, 532 (1998) ("Retroactivity is generally disfavored in the law . . . in accordance with fundamental notions of justice that have been recognized throughout history."). And it applies even if the retroactive application of the changed rule is performed because of a post-election court order. *See Burns*, 570 F.2d at 1078-79; *Roe v. Alabama*, 43 F.3d 574, 580-81 (11th Cir. 1995).

Because due process in the elections context prohibits "surprise to the voters and disenfranchisement," courts consider "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be"; and "(2) significant disenfranchisement that results" from a departure from those rules. *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998) (distilling caselaw). The NCSBE is and will continue to violate both elements. There is no real dispute that (1) North Carolina changed the rules that would apply to

this election after the election was over, and (2) the NCSBE is now retroactively applying those changes to presumptively invalidate up to 5,509 votes cast under the preexisting rules.

First, election officials repeatedly told overseas and military voters leading up to and during the 2024 election that they were *not required* to provide a photocopy of their ID when voting absentee. *Supra* Part III. They did so, formally and informally, numerous times. *Id*. For example, an NCSBE regulation, approved by a legislative oversight committee, also explicitly exempted these voters from the photo ID requirement applied to domestic civilian absentee voters. *Id*. This operative rule built on two prior administrative regulations that, for years, have maintained the same instruction. *Id.* The voters followed long-standing practice and election officials' repeated instructions that they could do so by signing the Affirmation of Military-Overseas Voter under the explicit threat of perjury prosecution, without the burdens of having to navigate obtaining an eligible voter ID (including while overseas) and then providing a photocopy with their application. The approximately 92 percent of these voters who submitted their ballots via official online channels did so in an NCSBE process that, consistent with the settled rules, provided no prompt or mechanism to provide a photocopy of their voter ID. *See* Cooper Rep. at 5. Those who elected to mail return their UMOVA ballot were not provided the security sleave given to domestic civilian absentee voters to include their photocopy of their voter ID. *Supra* Part III. And others who voted using the Federal Write-in Absentee Ballot, available for both federal and state elections, likewise had no opportunity or instruction for them to go out of their way to include ID. *Id*. Yet now, more than five months after the election, the NCSBE is retroactively applying new rules that directly contradict the rules and frameworks UMOVA List voters justifiably relied on to vote. *See, e.g.*, Webb Decl. ¶¶ 10-12; Kromm Decl. ¶¶ 8-12, 15, 21; Pierce Decl. ¶¶ 11-14; Conley Decl. ¶¶ 9-11.

These circumstances are reminiscent of the unconstitutional efforts to discard votes in *Griffin v. Burns*. There, a losing candidate challenged absentee votes cast by registered voters in a primary election and, after the election, the state supreme court retroactively invalidated those ballots as inconsistent with state law. 570 F.2d at 1078-79. The First Circuit held that the post-election negation of these ballots violated Due Process because the "issuance of [absentee] ballots followed long-standing practice; and in utilizing such ballots voters were doing no more than following the instructions" of election officials. *Id.* at 1075-77. The Court did not address the underlying issue of whether state law did or did not permit such ballots; it simply held that it was unconstitutional to retroactively apply a new understanding of an election rule that was contrary to reasonable instructions from election officials at the time of the election to discard votes cast in a previous election, regardless of the ultimate interpretation of state law. *Id.* at 1070. Other courts have similarly held that due process prohibits retroactively applying changes to settled election rules. *See, e.g.*, *Roe*, 43 F.3d at 580-81; *Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970).

Second, by any measure, presumptively invalidating the ballots of up to 5,509 UMOVA List voters is "significant disenfranchisement." *See Bennett*, 140 F.3d at 1226-27; *see also Burns*, 570 F.2d at 1068 (concerning 123 votes); *Roe*, 43 F.3d at 578 (concerning "[b]etween 1000 and 2000 absentee voters"). The potential availability of the NCSBE's so-called "verification" process does not alter the due process analysis under *Griffin* and *Hendon*. If anything, it exacerbates the constitutional issue by imposing a new burden on voters who were repeatedly told that they did not have to do *anything else* to cast their ballots in the 2024 election. Even if some of the overseas and military voters do ultimately navigate whatever process their individual county board establishes to have their votes counted, presumptively invalidating votes cast by eligible voters the state deemed qualified to vote—and then only counting their vote if they jump through additional

hoops in an unprecedented and wholly standardless process over a rapid thirty-day timeframe—unfairly imposes new voting requirements contrary to those in place when voters cast their ballots.

Thus, the NCSBE will violate Due Process by carrying out the order to retroactively apply changes to the voting rules for UMOVA List voters. The merits of the state court's interpretation of the state voter ID law—and whatever the NCSBE may do to implement that interpretation *in future elections*—are not at issue. *See McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187, Cahokia, Ill.*, 373 U.S. 668, 674 (1963) (where the state is "depriving [plaintiffs] of rights protected by the Fourteenth Amendment," "[s]uch claims are entitled to be adjudicated in the federal court" and "[i]t is immaterial whether respondents' conduct is legal or illegal as a matter of state law.") Rather, the only question is "whether the retroactive invalidation of ballots cast in an officially-endorsed manner amounted to a constitutional violation." *Burns*, 570 F.2d at 1073.

The answer here is a resounding yes. In circumstances such as these, "where the entire election process including as part thereof the state's administrative and judicial corrective process fails on its face to afford fundamental fairness," "a federal judge need not be timid, but may and should do what common sense and justice require." *Id.* at 1078. In this case, that means enjoining the NCSBE. Any other rule would "permit, if not encourage" what Griffin has done here: "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon*, 710 F.2d at 182 (quotations omitted).

### 2. Disenfranchising voters for administrative error violates due process.

While the Court need not proceed further, the NCSBE will also violate due process by disqualifying voters based on election officials own administrative errors. "To disenfranchise citizens whose only error was relying on" election officials who are deemed to have made an administrative error is "fundamentally unfair" and unconstitutional. *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *accord Hoblock v. Albany Cnty. Bd. of Elections*,

18

487 F. Supp. 2d 90, 94-96 (N.D.N.Y. 2006). Preventing such "arbitrary action" is "the very essence of due process." *Slochower v. Bd. of Educ.*, 350 U.S. 551, 559 (1956).

Newly apparent administrative errors affecting the UMOVA List voters cannot be the reason for their disenfranchisement. These voters were neither asked nor required by election officials to provide a photocopy of their voter ID when casting their UMOVA absentee ballot; in fact, they were told the opposite. *Supra* Part III. And if the UMOVA List voters had, nevertheless, believed it necessary to provide a photocopy of their voter ID, they lacked any official means to do so either via the electronic transmission or mail return process. Johnson Decl. ¶ 6; Cooper Rep at 5. Thus, even accepting that the instructions from election officials were erroneous, as the state courts have now determined, due process forbids the NCSBE from presumptively disqualifying unsuspecting (and otherwise qualified) voters for the state's own errors. *Husted*, 696 F.3d at 591.

### 3. Presumptively invalidating votes violates Plaintiffs' right to vote.

The NCSBE is and will continue to violate Plaintiffs' fundamental right to vote. "The Court has consistently recognized that all qualified voters have a constitutionally protected right to cast their ballots and have them counted," as "the right to have one's vote counted has the same dignity as the right to put a ballot in a box." *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (quotations omitted); *see also United States v. Weston*, 417 F.2d 181, 183 (4th Cir. 1969) ("The right to vote necessarily includes the right to have one's vote counted and counted at its full worth.").

The NCSBE has violated Plaintiffs' fundamental right to vote because the NCSBE is now presumptively invalidating their votes, such that their votes will not count in the Seat Six election absent further intervention. If the Court considers this issue under the *Anderson-Burdick* balancing framework that is designed to apply to *ex ante* (rather than *ex post*) government infringements of the right to vote, Plaintiffs still demonstrate a likelihood of success on the merits. *See, e.g.*,

*Greidinger v. Davis*, 988 F.2d 1344, 1353 (4th Cir. 1993).[1] The burden on the right to vote is severe, and the state's interest in discarding the votes of military and overseas voters, whose qualifications and eligibility is not in doubt, is neither compelling nor sufficiently tailored.

First, arbitrarily and presumptively disenfranchising up to 5,509 voters, despite their settled expectations based on election officials' repeated assurances, is a severe burden on the right to vote that must satisfy—but inevitably fails—strict scrutiny. *See Husted*, 696 F.3d at 592. The voters attest to the significant harms they face in having their votes invalidated after the election. *See* Kromm Decl. ¶¶ 14-21; Webb Decl. ¶¶ 14, 16-20; Pierce Decl. ¶¶ 18-20; Conley Decl. ¶¶ 15-16.

Second, even if the Court views the burden in lesser terms, minimal burdens on the right to vote must still "be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quotation omitted). Thus, regardless of the level of scrutiny, no legitimate countervailing state interest would permit this capricious and broad-scale disenfranchisement based only on post-election changes to the rules and pre-election administrative errors. This is especially so where, as here, all the voters are otherwise unquestionably qualified and there are *zero* indicia of fraud. And, as described *infra* Part I.B, there is even less legitimate interest in this selective disenfranchisement of voters in some

---

[1] The *Anderson-Burdick* framework is less apt because it only (1) applies to restrictions on the right to vote that are "nondiscriminatory," and (2) concerns *ex ante* restrictions on the right of "access to the ballot." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Buscemi v. Bell*, 964 F.3d 252, 262 (4th Cir. 2020) ("Any restrictions on access to the ballot necessarily 'implicate substantial voting, associational[,] and expressive rights protected by the First and Fourteenth Amendments.'" (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)). Here, the invalidation of Plaintiffs votes is both *discriminatory* (as described *infra* Part I.B.) and an *ex post* invalidation of their ballot after they have accessed it (as described *supra* Part I.A.1.). While Plaintiffs should prevail if the *Anderson-Burdick* framework is applied, this case fits squarely into the *Griffin v. Burns* and *Bush v. Gore* line of cases that the Court should apply.

counties, not similarly situated voters in others, based solely on the subjective targeting by a political candidate. The burden on the right to vote—the presumptive invalidation five months after an election—outweighs any state interest in facilitating a losing candidate for office waiting until after the results are set to challenge enough voters to attempt to change those results.

### B. The NCSBE is and will continue to violate equal protection by applying the new retroactive voting rules to only a subset of voters for no legitimate reason.

Besides violating due process and the right to vote, the NCSBE is poised to discard thousands of votes while counting votes cast by tens of thousands of similarly situated individuals in the exact same race. This "arbitrary and disparate treatment" of voters violates the Equal Protection Clause, *Wright v. North Carolina*, 787 F.3d 256, 259 (4th Cir. 2015) (quoting *Bush*, 531 U.S. at 104-05), which protects every voter's right "to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). The government may not "value one person's vote over that of another." *Bush*, 531 U.S. at 104-05; *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025) (courts "should not hesitate to" rely on *Bush v. Gore* for the "rudimentary requirements of equal treatment and fundamental fairness prohibits states from engaging in wholly arbitrary and disparate treatment of" voters).

The "constitutional concern" about equal protection is particularly acute in circumstances like this one that implicate post-election "discretion in areas relevant to the . . . counting of ballots." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 235 (6th Cir. 2011) (citations omitted). This is because the initial count of the ballots is already known, and post-election targeting of *only some* ballots is grounds for political mischief. *Id*. (noting that it is "particularly 'necessary to protect the fundamental right of each voter' to have his or her vote count on equal terms" during post-election review of provisional ballots (citation omitted)).

21

Here, the NCSBE is unconstitutionally discriminating between UMOVA List voters and similarly situated voters because of *where* they voted. Of the 32,033 total votes cast by UMOVA voters in the Seat Six election, the NCSBE is poised to presumptively invalidate, and will imminently discard, up to 5,509 UMOVA List voters, all of whom voted in one of four populous, Democratic-voting counties that Griffin targeted: Buncombe, Guilford, Durham, and Forsyth. Cooper Rep. at 5-6. It *will* count ballots cast in the same manner by UMOVA voters in the other 96 counties, without required them to do anything more. But *all* of these voters voted under the UMOVA, and *all* were instructed that they were not required to submit a copy of their photo ID with their ballot.

This arbitrarily differential treatment that creates a "preferred class of voters"—those voters who happened to vote in one of the counties Griffin did not target—is blatantly unconstitutional. *See Gray*, 372 U.S. at 379-80. The differential treatment is based on Griffin choosing to protest votes cast in  some counties where the voting results favored Riggs, but not in others that favored him. But the voters' county of residence is no legitimate justification for treating voters in four Democratic-voting counties differently from identically situated voters across the state. *See, e.g.*, *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 248 F. Supp. 3d 692, 703 (M.D.N.C. 2017) (concluding that law which "treat[ed] Greensboro citizens differently from citizens of all other cities in the state" likely violated equal protection); *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19 (S.D.N.Y. 2020); *Black v. McGuffage*, 209 F. Supp. 2d 889, 893 (N.D. Ill. 2002). Dr. Cooper explains that because of this targeting, voters expected to support Riggs were singled out five times higher than the total population of UMOVA voters across the state and five times higher than the total pool of 2024 voters. Cooper Rep. at 3-4.

Where, as here, state action that "involves a fundamental right" such as the right to vote results in "disparately treat[ing] similarly situated people," that action "must survive *exacting* judicial scrutiny." *Kim v. Bd. of Ed. of Howard Cnty.*, 93 F.4th 733, 740-41 (4th Cir. 2024) (emphasis added). The NCSBE's differential treatment furthers no legitimate state interest; it only serves Griffin's personal and partisan interests by discarding more voters thought to favor his political opponent. That fails even rational basis review because "'[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Dunn*, 405 U.S. at 355; *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 226 n.6 (4th Cir. 2016) (politicians cannot use state power to "impermissibly dilute or deny the votes of opponent political parties"); *Crawford*, 553 U.S. at 203 (similar).[2] North Carolina cannot "accord[] arbitrary and disparate treatment to voters *in its different counties*" or condition the franchise on how someone lawfully voted. *Bush*, 531 U.S. at 107 (emphasis added). The selective targeting of UMOVA List voters, for political gain, is precisely the type of "arbitrarily and unnecessarily valu[ing] some votes over other[s]" that "cannot be constitutional." *Black*, 209 F. Supp. 2d at 899.

## II. The equities strongly favor stopping the mass disenfranchisement Plaintiffs face.

### A. Absent injunctive relief, voters will suffer irreparable harm.

Plaintiffs and each member of the UMOVA List class—up to 5,509 voters that the NCSBE is set to presumptively disenfranchise—will suffer irreparable harm. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *LWVNC*, 769 F.3d at 247 (collecting cases). Plaintiffs and the other similarly situated voters did precisely what election officials said was required of them; the presumptive disqualification of their ballots that the NCSBE is ordered

---

[2] The NCSBE's so-called "cure" process only deepens the constitutional issue: presumptively invalidating votes cast by some voters and requiring only them (but not similarly situated voters) to "cure" their ballots is itself unlawful arbitrary and disparate treatment.

to undertake is irreparable harm. Even if some members of the class are ultimately able to "cure" their ballots through whatever process the NCSBE initiates, others almost certainly will not. And, regardless, every member of the class will need to undertake additional actions to "verif[y]" their votes over a short period of time or risk of having their votes in the Seat Six election discarded.

### B. Protecting voters' constitutional rights serves the public interest.

By definition, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Id.* at 247; *see also Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). And "upholding constitutional rights serves the public interest." *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Allowing the NCSBE to retroactively disenfranchise up to 5,509 voters—all of whom are, indisputably, qualified voters—would eviscerate their fundamental right to vote. It is in the public interest to issue an injunction forestalling this harm.

Further, because the public has a "strong interest in exercising the fundamental political right to vote," equitable principles "counsel extreme caution" in changing rules in advance of elections, especially as the "election draws closer." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (first and third quotations); *LWVNC*, 769 F.3d at 250 (second quotation). Even more so, changing the rules *after* an election, in a manner that would result in "discard[ing] completed ballots," is against the public interest and "would result in the voter confusion and disruptive consequences the *Purcell* principle is designed to avoid." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 227 (4th Cir. 2024). Once an election begins, and especially after it has concluded, the public interest favors maintaining "the stability and sense of repose that engender trust and confidence in our elections." *Id.* at 229. An injunction is necessary to uphold those public interests of trust and confidence in our elections.

/ /

/ /

24

## C. The balance of hardships strongly favors an injunction.

Complying with constitutional requirements imposes no hardship on the NCSBE. And, here, the requested injunction effectively maintains the status quo, which is "the last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012). The election was conducted following settled rules under which military and overseas voters were permitted to vote and have their votes counted under the clear instructions that a photocopy of their ID was not required. Plaintiffs' requested relief maintains that last-uncontested status quo.

County boards and the NCSBE have already approved and counted these ballots, recounted them twice, and then canvassed the results. The NCSBE was on the brink of certification when the state courts disrupted that status quo with an indefinite stay. It is the reinterpretation of election rules and the order to the NCSBE to apply that reinterpretation retroactively that disrupts the status quo. It further requires the costly expenditure of unnecessary resources to accurately identify the affected ballots, identify how each voter cast their ballot, and remove those votes from the totals. There is no hardship in *not* expending those resources to affirmatively disenfranchise voters.[3]

## CONCLUSION

Plaintiffs respectfully ask the Court to enter the immediate injunction halting the NCSBE from disenfranchising North Carolina voters, as set forth in the accompanying Proposed Order.


Dated: April 14, 2025                    Respectfully Submitted,

                                         /s/ *Jessica A. Marsden*
                                         Jessica A. Marsden

                                         Jessica A. Marsden

---

[3] Accordingly, the Court should further order that no bond shall be required under Federal Rule of Civil Procedure 65(c). *See, e.g.*, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

25

Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
jess.marsden@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 50855

Anne Harden Tindall
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
anne.tindall@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 31569

Samuel Jacob Davis
Election Law Clinic at Harvard Law School
6 Everett Street,
Cambridge, MA, 02138
Telephone: (631) 807-2327
State Bar No. 57289

Hayden Johnson*
Protect Democracy Project
2020 Pennsylvania Avenue NW, Suite #163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

John Paredes*
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
john.paredes@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

Stacey Leyton*
Danielle Leonard*
Juhyung Harold Lee*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108

26

Telephone: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
dleonard@altber.com
hlee@altber.com

*Notice of special appearance forthcoming*

27

**CERTIFICATE OF COMPLIANCE**

As required by Local Civil Rule 7.2(3)(A), I hereby certify that the foregoing document contains 8,396 words, not including items that may be omitted from the word count pursuant to Local Civil Rule 7.2(f)(1).

Dated: April 14, 2025                         */s/ Jessica A. Marsden*
                                            Jessica A. Marsden